IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

WATCHOUS ENTERPRRISES, LLC,
    Plaintiff,

vs.                                    Case No. 16-1432-JTM

PACIFIC NATIONAL CAPITAL, LLC, *et al.*,
    Defendants.

MEMORANDUM AND ORDER

In 2016, plaintiff Watchous Enterprises was attempting to secure financing for its oil and gas explorations. Defendant Pacific agreed to act as a broker to find a lender or joint venture partner for Watchous. To help secure the financing, Watchous alleges it gave a $175,000 deposit to the Waterfall Mountain Group,[1] a proposed investor endorsed by Pacific and its officers.

Watchous never obtained the financing from Waterfall, and alleges it lost the deposit. It filed this action against Pacific and Waterfall on December 7, 2016, alleging breach of contract, negligence, and fraud claims against Defendants relative to agreements relating to the proposed funding of a joint venture with Watchous. The Waterfall corporate defendants failed to appear and were ordered to show cause why they should not be held in default. On November 6, 2017, the court entered judgment against Waterfall in the amount of $175,000. (Dkt. 82).

The matter is before the court following Watchous's motion to enforce an alleged

---

[1] Waterfall International Holdings Limited, Waterfall Mountain LLC, Waterfall Mountain USA LLC, referred to collectively here as Waterfall.

April 3, 2017 settlement agreement against Pacific, and its motion for leave to file a Second Amended Complaint presenting RICO claims against the remaining defendants.

**A. Watchous's Motion for Summary Judgment as to the Settlement Agreement**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually

2

unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

On February 8, 2017, Watchous's attorney Jim Walker emailed a settlement offer to Charles Hyland, counsel for the defendants, asking for $175,000 to settle the case. Of this amount, $35,000 was to paid in ten days, with the remaining balance to be paid in two equal installments and bearing interest at 10% per annum pursuant to K.S.A. § 16-201.

The next day, Hyland forwarded the offer to William Mournes and Gordon Duval of Waterfall, and Charles Elfsten, the President of Pacific).

On February 24, Hyland responded to Walker, writing that his "clients are in general agreement with the offer, that is they will pay $175,000, but we will have some suggested edits to the terms you provided in the next couple of days."

On March 1, Elfsten of Pacific emailed Hyland about a draft counter-offer, and asked to see the draft because Pacific was a party to the lawsuit. Hyland sent Elfsten a redline version showing his proposed changes to Watchous' offer.

On March 3, 2017, Hyland sent Walker a counteroffer to settle the case.

Watchous's counsel responded by another counteroffer on March 9. Hyland forwarded this to Mournes, Duval and Elfsten.

Additional negotiations occurred during March, and Elfsten was included in communications relating to those negotiations.

On March 22, Watchous's counsel wrote to Hyland that "I appreciate your efforts to get this matter resolved. However, since we have yet to reach a settlement and the case's deadlines remain in place, we must move forward with litigation." He then asked for dates in April for the depositions of Elfsten, Mournes, Duval, and Pacific Senior Vice President Mark Hasegawa.

On March 30, 2017, Hyland emailed Elfsten, Duval, and Mournes:

All,

I just spoke to Watchous' lawyer. We have a deadline tomorrow to either agree on a mediator or report to the court our settlement agreement. I propose sending an email to counsel that says:

> Jim,
>
> Defendants agree to settle the case as follows:
>
> 1. Defendants will pay $175,000 as follows:
>
>    April 10, 2017 $35,000
>    May 10, 2017 $70,000 plus interest of $1,167 (10% x $140,000/12=$1,157)
>    June 9, 2017 $70,000 plus interest of $583 (10% x $70,000/12 = $583)
>
> 2. Upon full payment of the amount described in #l, Plaintiff will dismiss the case with prejudice with full release to all defendants, their officers and employees.
>
> 3. If Defendants do not pay the amount in #1, then Defendants agree that the unpaid amount will accelerate and Defendants well pay reasonable attorney fees to Plaintiff incurred enforcing the settlement agreement.
>
> 4. If Defendants do no [sic] pay the amount in #1, then the releases will not be effective, but Defendants will receive credit for any payment.
>
> 5. All agreements between the parties will be terminated and released as part of the settlement agreement, with the payments described herein the only payments owed.
>
> 6. The parties will jointly move the court to delay the pending deadlines to allow this agreement to be completed.
>
> 7. Each side will bear its own costs and fees (except as modified by #3 if Defendants breach the agreement).

Except for the payment dates, this offer is substantially identical to the offer that Watchous accepted.

The same day, Elfsten responded to Hyland, copying Mournes and Duval: "Charles, I like it. Bill and Gordon need to respond." He also wrote:

> Based on our conversation this morning, I thought you were going to send me an email confirming your responses and the open issues and those features of the settlement that appeared to be acceptable. The reason I thought that is because you said you would send me a confirming email.

On March 31, Hyland forwarded the prior email from Watchous's counsel to

4

Mournes, Duval, Elfsten and Hasegawa, writing: "I did not get you're [sic] okay yesterday on what I proposed. If what I proposed is acceptable, then let's let him know and we can avoid the requested discovery."

Elfsten replied to Hyland, "Charles, I was told yesterday that Gordon and Bill will talk to you this morning. Please let me know if they are OK with your proposal as I am told they are by Bill. Thanks for your help."

Hyland wrote back to Elfsten, "I just need confirmation from Bill that what I draft is okay to send to Watchous."

Later on March 31, Elfsten emailed: "Per my conversation with Bill Mournes just now, he told me to add 10 days to the April 10th date and let's add 10 days to the other two dates and submit it. Bill and I approve that." He also wrote that Mournes had said "he will call you shortly and I'm giving him your cell phone to do that."

On Monday, April 3, 2017, Hyland emailed Watchous' counsel stating:

Defendants agree to settle the case as follows:

1. Defendants will pay $175,000 as follows:

    April 21, 2017 $35,000;
    May 1, 2017 $70,000 plus interest of $1,167 (10% x 140,000/12=$1,167); and
    June 16, 2017 $70,000 plus interest of $583(10% x $70,000/124583)

2. Upon full payment of the amount described in #1, Plaintiff will dismiss the case with prejudice will full release to all defendants, their officers and employees.

3. If Defendants do not pay the amount in #1, the Defendants agree that the unpaid amount will accelerate and Defendants will pay reasonable attorney fees to Plaintiff incurred enforcing the settlement agreement.

4. If Defendants do not pay the amount in # 1, then the releases will not be effective, but Defendants will receive credit for any payment.

5. All agreements between the parties will be terminated and released as part of the settlement agreement, with the payments described herein the only payments owed.

6. The parties will jointly move the court to delay the pending deadlines to allow this agreement to be completed.

5

> 7. Each side will bear its own costs and fees (except as modified by #3 if Defendants breach the agreement).

Watchous's counsel responded less than four hours later:

> We accept your counteroffer. Who are the signatories for your clients? We will draft a settlement Agreement, but we consider the case settled on the terms in your email below. We will send you a draft email that we will propose sending to Magistrate O'Hara requesting a stay of all deadlines until June 21, 2017.

Hyland responded:

> Gentlemen,
>
> They have accepted our offer. We need to have our first payment to them by April 21 of $35k. If you pay the whole $175k before April 21 you can save a little interest.

On April 7, 2017, the parties filed a Joint Motion to Temporarily Stay Case, which the court granted three days later. Also on April 7, Hyland emailed Elfsten and Waterfall with instructions as to the April 21 settlement payment.

On April 10, 2017, Elfsten emailed Hyland, "is there a signed settlement coming?" Hyland responded, "Yes, there should be a formal agreement to review soon. We need to whether the formal agreement shows up or not make the first payment of $35,000 on or before April 21st." Elfsten replied, "Thank you. Than [sic] is Bill and Gordon's responsibility."

On April 17, Hyland again emailed Elfsten and Waterfall. Elfsten responded by asking, "isn't there usually a settlement signed before payments are made?"

Hyland responded in an email which was also sent to Mournes and Duval:

> Yes, usually, but courts will enforce agreements to settle as we memorialized in our email exchange. Despite the fact they have not submitted a formal agreement, we have an agreement that the court will enforce because the email exchanged outlined all the parameters of an agreement and the parties have acted on that agreement by seeking a stay of discovery. To keep the lawyer costs down, I would go ahead and send the first payment as I outlined so we are performing. If we make the payments as outlined in the email and they accept them, then the case will be dismissed with prejudice.
>
> If we miss the payment, Watchous will file a motion that we have

breached the email agreement and the court will likely grant that motion entering judgment in favor of Watchous against all named parties for the entire amount and costs. So let's make the payment and get this dismissed. With the payment I can follow up and get the formal agreement completed.

Watchous's attorney prepared and sent a formal agreement to Hyland on April 19. The draft provided that the defendants would make the payments specified in the April 3 counteroffer, and specifically defined "Defendants" to include Pacific.

Elfsten suggested revisions to the payment dates under the agreement, but did not suggest changes to this definition.

Hyland never accepted the April 19 offer or communicated with Walker about it.

On May 12, Watchous moved the Court to lift the stay in this case. The Court lifted the stay on May 19.

On June 8, 2017, Watchous filed a Motion for leave to amend its complaint and attached its proposed First Amended Complaint, which asserted, as one additional claim, that Pacific breached the settlement by failing to make the payments called for thereunder. The Court entered an order allowing Watchous to file its First Amended Complaint on July 7, 2017.

In the First Amended Complaint, Watchous has asserted, among other claims, that Pacific breached the settlement reflected in the April 3 email exchange.

The Answer of defendants Pacific, Elfsten, and Hasegawa was filed on August 22, 2017. In the Answer, Pacific alleges that it did not give Hyland, "authorization or implied consent to settle with Watchous on the terms alleged by Watchous in its First Amended Complaint."

No one has made any payment towards the $175,000, plus interest, owed under the settlement.

The Court entered default judgment against Waterfall on October 6, 2017.

The formation of a contract is generally a question of fact and the interpretation of

a contract is a question of law. *See U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012); *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011). *Reimer v. The Waldinger Corp.*, 265 Kan. 212, 214, 959 P.2d 914 (1998) ("whether a binding contract was entered into depends on the intention of the partes and is a question of fact"). "The formation of a contract requires the sort of fair understanding between the parties that normally accompanies mutual consent, along with evidence demonstrating that the parties met about the 'same matter' and reached agreement on basic contract terms." *In re Estate of Doffing*, 169 P.3d 1147 (Kan. Ct. App. 2007) (citing *Steele v. Harrison*, 220 Kan. 422, 428, 552 P.2d 957 (1976)).

"When the evidence pertaining to the existence of a contract or the meaning of the terms of the contract is in dispute, or the evidence pertaining to the existence of a contract or the terms of the contract admit to more than one inference, a question is presented for the trier of facts." *Continental Western Ins. Co. v. KFS, Inc.*, 30 Kan.App.2d 1262, 1268, 59 P.3d 1, 5 (2002) (citing *Hays v. Underwood, Administrator*, 196 Kan. 265, Syl. ¶ 1, 411 P.2d 717 (1966)).

In its motion for partial summary judgment, Watchous argues the court should grant judgment in its favor determining that the settlement agreement is a binding contract as to both Waterfall and Pacific. Pacific responds that Hyland had no actual or apparent authority to bind it to pay the settlement. It further argues that the court should either defer any ruling on the issue until after discovery, pursuant to Fed.R.Civ.Pr. 56(d), or that the court should grant summary judgment to Pacific, concluding that the email communications failed to create any binding contract. In its reply, Watchous clarifies that it is not, at least in the present motion arguing that Hyland had apparent authority to bind Pacific; it argues that he had actual authority to do so.

The court finds that it need not defer a ruling on the issue of Hyland's authority under Rule 56(d). Under the circumstances of the case, the plaintiff has failed to

demonstrate beyond a reasonable doubt that Hyland had actual authority to bind. At the same time, the Pacific defendants have failed to show the course of the email communications are so materially different that no binding contract could have existed.

Pacific argues that the April 19 proposed formal settlement is materially different from the earlier agreement: for example, it adds language of acceleration, indicating there was no meeting of minds as to what would occur in the event of default. The April 19 proposal also adds language of mutual release, and changes the effect of the settlement on prior agreements (from "terminated and released" to "void *ab initio*"). According to Pacific, the parties' subsequent conduct and counter-offer show there was no contract act all.

Watchous argues that the cases cited by Pacific all involved the effect of subsequent inconsistent conduct on prior oral agreements, and thus should have no application here because the parties had manifested an agreement to settle as reflected in the email communications of April 3. It argues that any subjective belief by Elfsten that the agreement only bound Waterfall is irrelevant, because the plain meaning of the April 3 communication is controlling. In particular, it relies on Elfsten's email of March 31, 2017 referencing a communication by co-defendant Waterfall and adding: "I ... approve that."

The court finds a fact question exists as to the existence of any contract. While Pacific does point to some differences between the email communications, such as changes to the timing of the payments and that the effect on the settlement would be to terminate the parties' earlier agreements or render them void, these difference could easily be seen as peripheral to the substances of the settlement, which was essentially to allow Watchous to recoup the missing deposit given to Waterfall. In arguing that no contract *could* exist, the burden is on the Pacific and it has failed to show that the differences among the various communications are so materially different that no contract could have existed. Certainly the defendants' own attorney believed the communications were sufficiently definite that he believed an enforceable contract had been created.

9

An attorney's appointment to represent a client includes no implied power to compromise and settle a client's liability. *Reimer v. Davis*, 224 Kan. 225, 229, 580 P.2d 81 (1978). For a client to be bound, the attorney must have either actual or apparent authority to settle the case. Here, the court finds that Watchous has failed to establish that Hyland had actual authority to bind Pacific be jointly liable to pay the $175,000 settlement. In the cited "I ... approve that" communication, the "that" is Waterfall's modification of the scheduled payment dates, and the decision to "submit" the modified proposal to Watchous." As discussed earlier, however, there is a material question of fact, in light of the all the circumstances of the case, as to the terms of any resulting contract.

More importantly, for purposes of determining the extent of Hyland's actual authority to bind Pacific, there is other evidence before the court — which Watchous never addresses — which strongly indicates that Hyland had no such actual authority. That is, Elfsten had specifically advised Hyland that only Waterfall should be responsible for paying the settlement agreement. Thus, on February 8, 2017, Elfsten wrote to Hyland that as to the current settlement proposal, "this is really up to Bill and Gordon as they are repaying their debt." He wrote to Hyland to the same effect on March 9, 2017: "Again, I am good with whatever Bill and Gordon does as they are paying for it."

Taken together, a rational fact-finder could conclude that Hyland had no actual authority to bind Pacific to pay the settlement, and the March 31 email was simply a direction for Hyland to submit a proposal to bind Watchous on behalf of defendants.

As an alternative, Watchous argues that even if Pacific had not authorized Hyland to obligate it to fund a settlement on the April 3 terms, Pacific remains bound because it ratified that agreement. Watchous notes authority recognizing that "[o]n acquiring knowledge of the unauthorized act of an agent, the principal should promptly repudiate the act, otherwise it will be presumed he has ratified and affirmed the act." *Theis v. duPont, Glore Forgan Inc.*, 212 Kan. 301, 304, 510 P.2d 1212, 1215 (1973). *See also Town Ctr. Shopping*

10

*Ctr. v. Premier Mortg. Funding*, 37 Kan.App.2d 1, 10, 1489 P.3d 565, 571 (2006) ([t]he key to ratification is knowledge of the unauthorized act; without a showing of the principal's knowledge, the principal cannot be deemed to have ratified the act").

> It is trite law that where one, without authority, assumes to act as the agent of another in making a contract, the principal must repudiate the transaction within a reasonable time after all the material facts in regard thereto have come to his knowledge, or he will be presumed to have ratified the contract.

*Hartwell v. Loveland*, 78 Kan. 259, 97 P. 432, 434 (1908).

The plaintiff bears the burden of showing Pacific ratified an agreement to be jointly and severally liable for the settlement. *See Gould v. Hutchinson Oil & Gas*, 150 Kan. 516, 95 P.2d 301, 306 (1939). Generally, decisions from other states view the issue of ratification as a question of fact. *See Mori Lee, LLC v. Just Scott Designs*, 325 Ga.App. 625, 754 S.E.2d 616 (2014) ("[w]hether [plaintiff] acted within a reasonable time to repudiate [its attorney']s actions" in settling dispute "is a matter for the jury to determine"); *Bevercombe v. Denney & Co.*, 40 Id. 34, 231 P. 427, 430 (1924); *National Life Ins. v. Headrick*, 63 Ind.App. 54, 112 N.E. 559, 561 (1916); *Strause v. Richmond Woodworking Co.*, 109 Va. 724, 65 S. E. 659, 132 (1909).

In this context, there is no bright line or fixed meaning as to what is "prompt" repudiation. There is some indication that whether repudiation occurs within a "reasonable time" should be determined by reference to any substantial benefit to the principal, or injury to the other party, arising by the delay. Thus, in *Theis*, 212 Kan. at 305, the court observed that "the requirement of prompt repudiation is to prevent an investor from withholding his disapproval until the market has taken a turn for the worse, and then deciding to assert the alleged wrongdoing," and without such a rule "he might sit back and quietly accept profits resulting from an unauthorized trade when it turned out to be to his advantage." *See also German Ins. Co. v. Emporia Mut. Loan & Sav. Ass'n*, 9 Kan.App. 803, 59 P. 1092, 1094 (1900) (ratification is "[t]he acceptance by a principal of the fruits of an unauthorized contract made by his agent, with full knowledge of all the facts"); *Aultman Threshing & Engine v. Knoll*, 71 Kan. 109, 79 P. 1074, (1905) (under doctrine of ratification a

principal "'cannot avail himself of it so far as it is advantageous to him, and repudiate its obligations'") (quoting Mechem on Agency, § 130).

Here, the court finds plaintiff has failed to establish that Pacific ratified its alleged joint and several liability under the alleged April 3 settlement. When the April 19 formal agreement was not executed, the proposed settlement failed, and the present action, which had been stayed, was promptly resumed, with Watchous adding by amendment a claim for breach of the putative settlement. To this claim, Pacific filed a timely Answer, denying that Hyland had authority to reach an agreement under which it was jointly and severally liable with Waterfall. The plaintiff has failed to identify any substantial benefit obtained by Pacific, or injury to itself, arising from the delay. Accordingly, the court finds that plaintiff has not shown that it is entitled to enforce the April 3 agreement against Pacific under the doctrine of ratification.

**B. Proposed Second Amended Complaint and Fraud Claims**

To summarize from the current and proposed complaints, Watchous alleges that it executed two brokerage agreements with Pacific. In the first, Pacific agreed to find lender financing, in exchange for a non-refundable deposit of $5,000 and a success fee of 1.25% of the gross loan proceeds. In the second, Pacific would attempt to locate a joint venture partner, in exchange for a non-refundable deposit of $7,600 and a success fee of 3% of the gross proceeds

Hasegawa, Pacific's Chief Financial Officer, informed Watchous that the Waterfall Mountain Group of companies were potential lenders or joint venture partners, and indicated a close relationship between Pacific and Waterfall. On June 8, 2016, Hasegawa identified as a potential joint venture partner the "Irish fund we represent (Waterfall Mountain Group)." He also wrote that Waterfall was "extremely good friends" with

Elfsten, Pacific's CEO.

Between June 26 and 29, 2016, Watchous and Hasegawa communicated about a potential bridge loan, and Watchous' willingness to meet with lenders. Hasegawa stated "we're thinking the joint venture (our fund) takes out the hard money loan making it somewhat painless and we believe they'd do that." He stated that Waterfall — "our fund" — would want detailed resumes concerning the main principles involved in Watchous' day-to-day operations.

Between July 12 and 14, 2016, Hasegawa and Watchous discussed the sources and uses of funds for the over $40 million in financing Watchous was seeking. Hasegawa wrote that Pacific wanted to get the information out to their fund, Waterfall Mountain, as soon as possible.

Watchous responded with this information on July 17, 2016. Discussing a potential joint venture valued at $80,000,000, Hasegawa wrote its fund was "closing on two more bonds this month worth 2.4 billion so we will have options."

At about the same time, Elfsten wrote to Watchous that "our JV [i.e., a joint venture with Waterfall] would be great."

On July 19, 2016, Hasegawa stated that Mournes liked the proposed joint venture and could help fund it.

On July 20, 2016, Elfsten wrote Mournes, Waterfall's Managing Director, and copied Hasegawa and stated, in part:

> We'll try to have the Palomino joint venture to you later today. It is extremely juicy and is very negotiable, whatever is fair. We laid it out where if you gave them about $100 million it would be all gotten back within 5 years with just a 50/50 return. We could make a higher return and drop the amount way down and they have about 300 sites they can drill that are all shallow about 2,300 ft deep. You'll see the write-up from Mark later today and we'll make sure we send it to Mark Zouvas. We have some competition from Beal bank offering them $45 million at 7% and $12 million for drilling at 7% but they kind of want their right and left nut for it and I think you can make them a better offer and they like the idea of having a money partner and they are extremely experienced with a lot of equity. This could probably be locked up for $10 million cash now and a promise for future cash off the

13

next bonds and a 80/20 payout until you get your money back as long as they have enough money to live.

Hope things are going better for you today, wish we had the money to help you. As you know, we're a little on the tight side.

On July 25, 2016, Pacific introduced Watchous to Waterfall in order to discuss the funding of the $80,000,000 joint venture. Mark Zouvas, a Waterfall employee, appeared on behalf of Waterfall.

On July 29, 2016, Hasegawa represented to Watchous that he and Elfsten had "just talked to our [i.e., Waterfall's] fund manager Bill [Mournes] and we are laying out different options of how to do the joint venture quickly. He liked the idea and could probably fund not the whole thing, but a big part of it from funds he has coming the end of this month, which could be good timing."

The Second Amended Complaint alleges Pacific repeatedly represented that it had a history of successful transactions with Waterfall, and that Waterfall was a suitable joint venture partner. Specifically, Pacific informed Watchous that it had been involved in over 28 transactions with Watchous and that it was operated by one of Elfsten's very close friends. Pacific and Elfsten now deny that they engaged in prior transactions with Mournes and Waterfall.

Watchous alleges that Mournes and Duval, a member of Waterfall, represented that Waterfall had the ability to enter into a joint venture with Watchous. Mournes and Pacific stated that Watchous needed to make a $175,000 refundable deposit to put it at the top of Waterfall's list for a potential ventures.

On July 28, 2016, Watchous and Waterfall executed a Letter of Intent describing the proposed structure of a joint venture. Section 9 of this LOI states:

**Deposit to Waterfall's Counsel's Trust Account**

Contemporaneous with execution and delivery of this LOI, Enterprises shall make a refundable deposit of One Hundred Seventy-Five Thousand Dollars ($175,000) to the Waterfall account at Chase Bank. This deposit shall be refunded upon the earlier of the Closing or the earlier termination of this LOI

14

as provided in Section 10.

Under Section 10:

> Either party may terminate this Agreement if the Definitive Agreements have not been executed by the parties on or before August 17, 2016, or if the other party to this LOI materially breaches its obligations under this LOI.

On July 29, 2016, Watchous deposited $175,000 in "Counsel's Trust Account."

The same day, Duval emailed Mournes and stated:

> I am very pleased to report that this morning we received the funds necessary to send the $160,000 to Dr. Tinoco so the SWIFT can go out. I forwarded the $160,000 immediately to Dr. Tinoco. The funds came Palomino Petroleum [an entity owned by Watchous]. This is their website: http://www.ppiks.com/about. This is the group that flew in with their CEO, CFO, chief engineer, attorney, and other officers from the Midwest on their private plane (pictures attached) to meet with Bill earlier this week. This is a very sophisticated oil company that reviewed our business plan, our projects, and checked many of our references. They were very thorough and knew exactly what to look for. They have been in business for decades and are already producing millions of dollars of oil per year. They were impressed and acted very quickly. Mark Zouvas and Bob Bench did a good job answering their technical questions. But this funding only occurred because of Bill Mournes' amazing capacity to just keep working tirelessly until he finds a solution. His relentless effort to keep plugging away until a solution appears is what made this funding possible. I often complain to Bill that we need to focus on one thing at a time and cast aside the 10,000 other distractions. But in this case, we succeeded because of Billy's ability to juggle many balls at the same time.
>
> I want to thank you for your support after our "call to action." Many people stepped forward to contribute what they could. That is very gratifying to have loyal friends that are still standing by us through this difficult process. The sad this is that most of our crew are pretty tapped out because this has been such a long and difficult process that none of us could have anticipated. That is why this money coming in from the oil company was literally a miracle, and we should never forget the source of such miracles. Say a prayer of thanks.
>
> We are now asking Jose and Dr. Tinoco to push the BCV to do its part. As soon as possible Dr. Tinoco will be meeting with the BCV to get the 199 sent. We will still need funds for travel and other operational costs but hopefully we can pass the hat for those needed funds.
> Thanks for your help.
>
> Gordon

Mournes forwarded this email to Elfsten. Elfsten responded to Mournes and copied

15

Hasegawa and Zouvas, stating: "Bill, we thought it was going directly to the bank which is what we told Klee. This is a funny email giving Bob the credit and not even mentioning us. O well."

None of the defendants informed Watchous that the deposit was not being held in Waterfall's 's Counsel's trust account as agreed, but had been transferred for a separate venture in Venezuela. Watchous and Waterfall never came to an agreement regarding the terms of the joint venture.

On August 23, 2016, Watchous wrote Hasegawa and informed that Watchous would like to engage Beal Bank because Waterfall had provided no concrete evidence that the deal would close.

In response, Hasegawa stated we "totally understand you going forward with Beal, but don't count Bill out even though he is extremely unorthodox, which we said going into it."

Afterwards, the defendants made various representations that Waterfall would refund the deposit to Watchous, but this never occurred.

On September 1, 2016, Watchous terminated the Letter of Intent. According tot he Second Amended Complaint, Waterfall has refused and failed to refund the deposit

Watchous further alleges that Pacific failed to report that Mournes had significant debt, that Waterfall did not have the ability to enter into the transaction, or that the individuals related to Waterfall (Mournes, Duval, and Zouvas), were defendants in lawsuits in which adverse parties contended that they were misled and defrauded by Mournes, Duval, or Zouvas.

Watchous argues that the proposed Second Amended Complaint presents valid claims for violation of both 18 U.S.C. § 1962(c), which prohibits persons associated with an enterprise from participating in a pattern of racketeering activity, and § 1962(d), which prohibits conspiring to violate the RICO statute. The defendants charged with violating

RICO contend that the proposed complaint is deficient because it fails to demonstrate the defendants "(1) participated in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Tal v. Hogan*, 453 F.3d 1244, 1269 (10th Cir. 2006 (citing *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1362 (10th Cir. 1989)). Citing *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 989 (10th Cir. 1992), the defendants argue Watchous must demonstrate each of the elements of a RICO claim with particularity, but the proposed complaint in fact fails to show the particular conduct of each defendant, does not show any specific acts of racketeering activity, fails to define the alleged "enterprise" involved, and does not establish a pattern of activity.

The court hereby grants leave for the filing of the Second Amended Complaint. The proposed complaint pleads with particularity the communications underlying the alleged fraud. *See Robbins v. Wilkie*, 300 F.3d 1208, 1211 (10th Cir. 2002) (requiring pleading with particularity RICO predicate acts grounded on fraud, but not all elements of RICO claim).

First, the court finds that the Second Amended Complaint alleges that the defendants committed specific acts of wire fraud by using emails and telephone conversations to falsely represent Waterfall's financial ability to participate in the proposed $80 million joint venture. In fact, according to Watchous, Waterfall could barely cover its own operating costs, and was in no condition to offer funding to the plaintiff. These communications include emails from Hasegawa and Elfsten on behalf of Pacific, and by Mournes, Duval, and Zouvas on behalf of Waterfall. Zouvas also personally met with Watchous in a meeting in late July. Each of these cited events occurred prior to Watchous' deposit of $175,000 with Waterfall. (Second Am. Complaint, ¶¶ 19-32).

Second, the proposed Second Amended Complaint adequately identifies the defendants' common purpose (inducing Watchous to provide funds). For purposes of RICO, an "enterprise" is not limited to hierarchical structures, but may include individuals who associate in loose confederation to join a common purpose. Such an association in fact

17

may exist in the absence of formal structures, so long as it "function[s] as a continuing unit and remain[s] in existence long enough to pursue a course of conduct." *Boyle v. United States*, 556 U.S. 938, 948 (2009).

In pursuit of this common goal, the Second Amended Complaint makes specific allegations about the interrelationships among the individual defendants and the Pacific and Waterfall corporate entities.

The proposed complaint is weakest in alleging a "pattern" of criminal activity. Watchous alleges that the individuals associated with Waterfall have engaged in similar fraudulent activity before, but at this point the complaint specifically identifies cases occurring some ten years before the present transaction, and none of these cases apparently involved the Pacific defendants. At the same time, the court recognizes that Watchous does allege the existence of an ongoing scheme with earlier victims, and that the plaintiff has not had the benefit of full discovery. It further notes the allegations in the case that the Pacific defendants had a long history of working with Waterfall, and accordingly may have known of such transactions.

A pattern of activity under the RICO statute means "a series of related predicates that together demonstrate the existence or threat of continued criminal activity." *RJR Nabsico v. European Community*, 136 S.Ct. 2090, 2096 (2016). This threat of continuity may be shown by demonstrating that "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 249 (1989). Demonstrating the existence of a pattern of racketeering activity may be satisfied by proof of prior acts with "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events is essentially all that is needed." *Bixler v. Foster*, 596 F.3d 751, 761 (10th Cir. 2010).

In addition to opposing the motion for leave to file the Second Amended Complaint,

the defendants also argue that the court should also dismiss Watchous's claims of fraud and conspiracy. Watchous responds by contending that, having answered the First Amended Complaint, the defendants are precluded from challenging their sufficiency now under Fed.R.Civ.Pr. 12(b)(6).

The court finds that the issue is properly before the court, and may be considered as a motion for judgment on the pleadings under Rule 12(c), for which relief is granted under a standard identical to Rule 12(b)(6). *See Hudson Assocs. Consulting, Inc. v. Weidner*, No. 06-2461-EFM, 201 WL 1980291, at 3 (D. Kan. May 14, 2010) (defendant sought relief under Rule 12(c) after filing prior responsive pleading, the court noting that this "is a distinction without a difference as the standard is the same under Rule 12(c) and Rule (12)(b)(6)").

However, the court finds the defendants' motion to dismiss should be denied. In the separate memoranda of the Pacific and the Waterfall defendants responding Watchous's request to add its RICO complaint, the request to dismiss the fraud claims is offered without any independent discussion, (Dkt. 121 at 13; Dkt. 126 at 12), the defendants simply stating that such relief should be granted "[f]or the reasons stated above" in their discussion of the RICO claims.

But, as stated above, the court has found that plaintiff's claims present colorable claims under RICO, prefaced on specific allegations of predicate acts of wire fraud by the named defendants. Accordingly, the court will deny the defendants' request to dismiss these claims.

IT IS ACCORDINGLY ORDERED this 25th day of July, 2018, that the motions of plaintiff for partial summary judgment (Dkt. 86), Pacific National's cross-motion for partial summary judgment (Dkt. 101), and the motions to dismiss of defendants (Dkt. 120, 125) are hereby denied; plaintiff's motion for leave to amend (Dkt. 109) is granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE