IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


WATCHOUS ENTERPRISES, LLC,
            Plaintiff,

    vs.                                            No. 16-1432-JTM

PACIFIC NATIONAL CAPITAL, *et al.*,
            Defendants.



MEMORANDUM AND ORDER


In 2016, plaintiff Watchous Enterprises was searching for a joint venture partner to help in developing oil and gas production opportunities. Watchous hired Pacific National Capital as its agent to help locate potential partners, and Pacific singled out Waterfall Mountain as the best candidate. Watchous paid $7,600 to Pacific for its services, and later $175,000 to Waterfall as a supposedly refundable deposit. The money was transferred to Venezuela, and is gone. Watchous alleges Pacific and Waterfall concealed Waterfall's dubious finances, and brings the present action for fraud, breach of fiduciary duty, racketeering, and civil conspiracy.

The matter is before the court on cross motions for summary judgment. The court concludes that the plaintiff is entitled to summary judgment on its claims of fraud and breach of fiduciary duty. The court finds that the claims of racketeering and civil conspiracy must be resolved at trial.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove nonmovant's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).

One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**General background**

Watchous is a limited liability company organized and existing under the laws of Kansas, and its members are all citizens of Kansas.

The Waterfall defendants include Waterfall Mountain and Waterfall Mountain USA (Utah limited liability companies) and Waterfall Mountain International Holdings Limited (an Irish limited liability company). The Pacific defendants characterize the Waterfall Mountain entities as companies "providing funding and partner syndication of select energy, natural resource, technology and real estate projects." (Dkt. 204, ¶ 1). As the plaintiff notes, however, while this is the ostensible business of Waterfall, there is no evidence that these entities have actually funded any energy project.

William J. Mournes, a resident of New Jersey, is a director and officer of Waterfall Mountain International Holdings, and a member of Waterfall Mountain USA and Waterfall Mountain. Mournes developed a plan whereby he would cause the Banco Central de Venezuela to register billions of dollars in sovereign bonds in the name of Waterfall or its lender, and Waterfall would obtain a loan against those bonds to invest

in energy projects in the United States and elsewhere. Mournes has acknowledged that no one had ever completed a similar transaction.

Certain bonds were blocked in favor of Waterfall and its lender, RPB Company, to allow them to structure a potential transaction. However, while Waterfall was given a "beneficial" ownership, neither Waterfall nor RPB owned the bonds absolutely. The Banco Central de Venezuela owned the bonds and had to approve the transaction. At all times relevant to Watchous, the bonds could only be used for collateral for a loan.

Waterfall represented it was on the verge of closing the transaction since at least 2013.

Watchous cites evidence indicating that Charles Elfsten (President of Pacific) is a long-time friend of Mournes, that Mournes asked him to form a company to act as Waterfall's agent to find oil and gas ventures into which Waterfall could invest, and that Elfsten created Pacific in 2012 for that purpose. Pacific argues that Bryan Harveston, whose testimony supports Watchous's allegation, lacks personal knowledge of the relationship between Elfsten and Mournes. Elfsten acknowledges that he may have met Mournes when both men were at Camp Pendleton in the 1980s, but denies meeting him. According to Elfsten, he created Pacific before he knew of Waterfall's existence.

It is uncontroverted that Pacific is a for-profit corporation organized and existing under the laws of California and its principal place of business is located in Irvine, California. Elfsten is the President of Pacific and Mark Hasegawa is the Senior Vice

President. It is also uncontroverted that Elfsten told Watchous that he had "known Bill Mournes for 30 years and have been involved in prior transactions."

Pacific has served as a finder for dozens of oil and gas-related ventures, including financing for gas-distribution hubs, gas stations and a headquarters for Petroleum Wholesale out of Woodlands, Texas, and for oil and gas leases, a gravel pit and gas stations for the Pelican Group out of Uintah Basin. In its capacity as a finder, Pacific has approached numerous lenders and potential investors as funding sources for its clients, some of which have provided funding for Pacific's clients.

Pacific and Waterfall are separate entities, and Waterfall has no express contracts with Pacific. However, the two entities have worked closely together, with Pacific bringing some 50 projects to Waterfall. Pacific hosted and was paid to fix Waterfall's website. As the facts set forth below establish, Pacific effectively negotiated on Waterfall's behalf. Further, although there may have been no express contract, many facts strongly suggest the two entities had a close coordination of efforts.

The Pacific defendants contend that the company has no inside relationships to potential financiers. However, as set forth below, there is evidence that Pacific and Waterfall had a close and highly profitable relationship, and that Pacific charged the prospects upfront fees on behalf of Waterfall. One email indicates that Pacific and Waterfall were acting as a "team." Accordingly, the rejects the defendants' allegation of a lack of any inside relationship.

At a minimum, as it relates to potential funding by Waterfall, Pacific entered into 56 non-exclusive placement agreements (shown in Table 1), earning a total $324,850 in underwriting fees, even though none of these potential projects actually resulted in funding from Waterfall.

Table 1

| Project Name | Agreement | Fee ($) | Location |
|---|---|---|---|
| Hangtown Energy | 5/24/2013 | 3,500 | CA |
| Stratex | 8/7/2013 | 3,500 | UT/KS/WY |
| Adams Capital | 11/18/2013 | 3,500 | CA |
| Fortis Resources | 11/25/2013 | 3,500 | TX |
| Vision Energy | 12/9/2013 | 3,500 | CA |
| SIPCO | 12/23/2013 | 5,000 | Columbia |
| REEF Resources | 1/10/2014 | 5,000 | Canada |
| Cooper Ellerby | 1/27/2014 | 5,000 | Canada |
| Tundra Wolf | 2/14/2014 | 5,000 | Canada |
| Tundra Wolf | 2/14/2014 | 5,000 | ND |
| C.E./Golden Birch | 2/14/2014 | 5,000 | Canada |
| Ridgeland | 3/24/2014 | 5,000 | WY |
| Santa Fe | 3/27/2014 | 5,000 | CO |
| Charterpost | 4/30/2014 | 5,000 | NV |
| Rippy Oil | 5/9/2014 | 5,000 | TX |
| Prod. Specialties | 5/11/2014 | 5,000 | CA |
| PAC Drilling | 5/19/2014 | 5,000 | OH |
| Frogville | 5/21/2014 | 5,000 | CA |
| Petrodorado | 6/26/2014 | 5,000 | Columbia |
| Thurston | 6/30/2014 | 5,000 | UT/TX/CO |
| Roya Resources | 7/22/2014 | 5,000 | CA |
| Oceania O&G | 8/13/2014 | 7,600 | Brazil |
| Stormhold Energy | 10/2/2014 | 5,000 | Canada |

| | | | |
|---|---|---|---|
| MD Development | 10/14/2014 | 5,000 | OK |
| Brightstone Energy | 10/14/2014 | 5,000 | TX |
| Rock Oil | 10/25/2014 | 5,000 | MT, ND |
| Segundo Petroleum | 11/5/2014 | 5,000 | CA |
| MD/AEOG | 12/17/2014 | 5,000 | OK |
| Chinook | 1/16/2015 | 2,500 | Canada |
| Hard Rock Dev. | 2/16/2015 | 2,500 | CA |
| Ocean Grove Dev. | 3/18/2015 | 3,750 | OR |
| Rainbow 66 | 3/31/2015 | 5,000 | OK |
| SWR, Inc. | 4/30/2015 | 7,600 | CO |
| Oolite Investments | 5/27/2015 | 7,600 | LA |
| TMC Energy | 7/9/2015 | 7,600 | LA |
| Elis Energy | 9/12/2015 | 7,600 | PA |
| Apogee O&G | 9/21/2015 | 7,600 | OK |
| Hussey O&G | 11/6/2015 | 7,600 | NV |
| KOI Water Group | 12/8/2015 | 7,600 | Canada |
| Solus Oil & Gas | 1/10/2016 | 7,600 | TX |
| One Call Energy | 2/6/2016 | 7,600 | Canada |
| Santa Fe Petroleum | 3/2/2016 | 7,600 | TX |
| Homestead Energy | 3/14/2016 | 7,600 | Canada |
| Ace Energy | 3/21/2016 | 7,600 | WV |
| Calx, LTD | 3/31/2016 | 7,600 | Canada |
| Rainbow 66 | 4/20/2016 | 3,800 | OK |
| 3-D Oil | 5/16/2016 | 7,600 | CA |
| Watchous Enterprises | 6/4/2016 | 7,600 | KS |
| Watchous Enterprises | 6/4/2016 | 5,000 | KS |
| Swan Creek | 6/22/2016 | 7,600 | TN/GA |
| Catch Resources | 6/22/2016 | 7,600 | Canada |
| Catch Resources | 8/15/2016 | 7,600 | Canada |
| Clear Creek Res. | 9/22/2016 | 7,600 | KY |
| KRG Global | 8/1/2016 | 7,600 | |
| BHEA Portfolio Zero | 1/6/2017 | 7,600 | |
| BHEA Portfolio Zero | 4/13/2017 | 7,600 | |

The non-exclusive placement agreements generally provided that Pacific would receive a percentage of any monies it located for a client. Pacific had a vested interest in

Waterfall closing its bond transaction because it would receive millions of dollars in fees if Waterfall was able to fund the projects Pacific brought to it.

Hangtown Energy, Inc., one of the first prospects Pacific brought to Waterfall, is associated by Mark Zouvas and Vincent Ramirez. Pacific introduced Hangtown to Waterfall as a potential funding source, but Waterfall was unable to fund the project. Hangtown filed for bankruptcy in Nevada in 2014, and the bankruptcy proceeding is still pending.

Zouvas acted or appeared to act as an officer of Waterfall, and acted as consultant for Waterfall and championed or advocated for projects for Waterfall. Zouvas (or entities) associated with him have received tens of thousands of dollars from Waterfall. Zouvas is owed over $500,000 from Waterfall for consulting fees, and stood to receive additional compensation if Waterfall closed its bond transaction. He would also receive additional monies if projects he evaluated for Waterfall closed.

Gordon Duval is an officer, director, or manager of each of the Waterfall entities. He has received hundreds of thousands of dollars from Waterfall in legal fees and is owed millions of dollars in attorney fees.

Elfsten and Hasegawa believed that Waterfall would be funding its bonds as early as 2013.

Mournes received over $300,000 in advances from Waterfall for his personal benefit, and stood to receive 2% of the proceeds from the contemplated bond transaction.

**The Vision Energy project (December 2013-May 2015)**

Todd Habliston is the managing member of Vision Energy Partners, a Colorado oil and gas company which owned leasehold interests in the Capitan field in California. Vision analyzed the geology and completed financial analysis and planning for the development of the interests. In 2009, it conveyed the right to develop these interests to Amrich Energy for a three year period. Amrich Energy did not develop the interests and the right to develop the interests reverted to Vision in 2012.

In late 2012 or early 2013, Vision sought $25,000,000 in funding to develop its leasehold interests itself. Vision was introduced to Pacific by a broker named Jon Carpenter.

On or before December 9, 2013, Habliston spoke with Elfsten by phone. According to Habliston, Elfsten told him that Vision's project passed screening criteria and that Pacific had a fund with connections to the Middle East that could fund Vision's project. According to Habliston, Elfsten and Hasegawa represented that this fund currently had monies available to invest and that Pacific had done prior successful deals with the fund., and that he later learned the fund manager was Mournes. Elfsten denies this, stating he told Habliston there were other funds available besides Waterfall, and did not promise that any funds actually had money available to invest.

On December 9, 2013, Hasegawa emailed Habliston a copy of a draft non-exclusive fee agreement and wire instructions for a $3,500 processing/underwriting fee. Habliston asked Elfsten for references in the form of contact information for anyone they had

funded previously, but Elfsten refused to provide references because Pacific needed to maintain confidentiality.

On December 11, 2013, Habliston emailed Elfsten stating:

As for the $3500 fee, would it make sense to pay after we meet in January (if that is still possible)? No problem to pay now, but if you think the deal with your investor is contingent upon a face to face meeting, a deferral might make sense. . .

Elfsten responded:

I can't engage without the fee. Now would be better as I would like to introduce to the investor but it's your call.

. . . A face to face isn't needed, what I would like to do is sometime soon get you in front of him for the reasons we discussed.

The parties disagree as to what this meant. Habliston has testified he understood Elfsten's comment that a face to face was not needed and that the project had already been approved to be funded. He also testified that Elfsten told him as much in prior conversations. Elfsten avers, however, that he only told Habliston that his project met Waterfall's initial criteria for preliminary approval.

On December 11, 2013, Habliston executed a Non-Exclusive Placement and Fee Agreement on behalf of Vision to retain Pacific to act as its agent to use best efforts to locate funding for Vision's project. Vision arranged for a $3,500 cashier's check to be mailed from its bank in Colorado to Pacific in California.

According to Habliston, Vision executed the Agreement and paid Pacific in reliance on Elfsten's representations that the fund had the monies readily available to

invest in Vision's project, that the monies could be provided in a matter of weeks, and that Pacific had done other transactions with the fund; Vision would not have taken these steps but for Elfsten's representations. Elfsten avers he made no such representations.

After Vision paid Pacific, it introduced Mournes and Waterfall as the intended funding source. Habliston had one short telephone call with Mournes concerning funding.

According to Habliston, after this call with Mournes, Elfsten and Hasegawa continued to act on behalf of Waterfall, and represented themselves as the face of Waterfall, despite the fact that he was Vision's broker and fiduciary.

On March 10, 2014, Habliston emailed Elfsten and stated:

Chuck – any news from the investor? When can they put up the cash for the deal? If it won't happen with this fund, possibly you can bring other investors to the table to earn the $3500 retainer fee that was paid in December.

Elfsten responded he did not "know of any other fund that will take on your project without having any of the proper approvals and will advance you money to attempt to obtain those approvals."

Habliston emailed again on April 1, 2014: "Chuck – start of 2nd Qtr. Any news from your investor? I was hoping we would have this wrapped up by now."

Elfsten responded by stating that the fund was waiting to hear from Vision on its approval and stating that the fund delay had been primarily because Mournes was

extremely sick with blood poisoning. Elfsten claimed that he would take the project to two other funds after he was provided an update on the approval process.

On September 5, 2014, Habliston emailed Hasegawa again asking for a status update.

Hasegawa emailed Habliston on September 8, 2014:

We got your obnoxious e-mail, but you never told us if you got your approval process completed or not. Waterfall Mountain is real and is in Dubai this month to open accounts and we have also recently been introduced to another fund out of Mexico that we could present your project to, but no one will want to give you money until they know the project is has been approved.

Habliston responded the same day:

The original funding request on Dec 2013 and Jan 2014 was for $1.2 million, which was the amount estimated to get the project approved (entitled). . . .

A bit of a chicken and egg. When I was first introduced to PNC and to the gentleman at Waterfall Mountain, everyone understood (or so it seemed) that this project needed early debt or equity infusion for $1.2 million, which would turn into $25-$40 MM commitment after approvals were in place. I have since provided PNC with a broader business plan for an expanded business in CA, which is what I understood everyone wanted.

Habliston sent Elfsten and Hasegawa updated information about Vision's project in November 2014. It is uncontroverted that neither Elfsten nor Hasegawa informed Vision that Waterfall still did not have the monies available to invest in Vision's project.

Ramirez then called Habliston concerning Vision's project. It was Habliston's understanding that Ramirez was assigned responsibility for Waterfall's relationship with

Vision's project through the final steps before Waterfall funded it. It is uncontroverted that Ramirez misrepresented to Habliston that Waterfall had funded Ramirez's project.

On January 13, 2015, Habliston emailed Ramirez additional information concerning Vision's project at his request.

On February 14, 2015, Ramirez, returned a Non-Disclosure Agreement to Habliston executed by Mournes on behalf of Waterfall.

On March 23, 2015, Habliston emailed Ramirez because he expected to receive term sheets from other potential funding sources.

Ramirez responded:

> We are still waiting on funding, which was delayed 2 weeks due to turmoil in Venezuela. Apparently the final stage has been set. This means that WFG will meet the second week of April to appropriate funds for projects. . . .
>
> Anyway, that is where we are today. I am fully confident in the WFG funds, as I review the original paperwork for each part of the transaction.

This was the first time Habliston learned that Waterfall did not have funding currently available.

The following day, Ramirez emailed Habliston and represented that he promoted Vision's project as a "Tier 1" investment and represented that Waterfall's funds would be liquid in 12 days.

On May 15, 2015, Habliston emailed Ramirez because he had not heard anything. Ramirez responded, in part:

> Much has happened here, and it is good, but mostly internal things within our company. We are still waiting on actual money. I was told that our

leader is in Dubai, which is the very last step in turning the assets into cash, i.,e., he is getting the check book. . .

On the upside, I have been promoted to the Executive committee and am one of five members to determine the allocation of funds. Your project fits my criteria extremely well.

On May 28, 2015, Ramirez emailed Habliston and stated, in part, rumor "has it that the money has arrived and will be picked up next week. However, I have been through so many '1 week' delays that I am not holding my breath."

Habliston and Vision have not heard from Defendants since May 28, 2015. Vision has not seen any evidence to suggest that Pacific pitched its project to any potential funding source other than Waterfall. Hasegawa states in his affidavit that he did market the Vision project to other potential investors, but provides no documentation supporting such marketing. Hasegawa also condemns the Vision project as speculative and "risky and unproven."

In the end, it remains true that Pacific never warned Vision it was unlikely to get funding from other sources, or that the recommended Waterfall fund actually had no liquid assets to lend.

## The Ridgeland Operating project (March 2014-December 2014)

Ridgeland is a Utah oil and gas operating company. Bryan Farris was its co-founder and President.

In March of 2014, Ridgeland came into contact with Pacific as it sought millions in funding a Wyoming prospect. Farris had a telephone conference with Hasegawa and Elfsten, after Hasegawa expressed that Pacific was interested in Ridgeland's prospect. According to Farris, the parties discussed Ridgeland's project and Pacific seemed very confident that they had sources who could fund Ridgeland's project.

On March 20, 2014, Hasegawa emailed Farris (with a copy to Elfsten) stating that the "fund has looked at your project and is very interested as it is near property they have and are obtaining around the area." Hasegawa attached a Non-Exclusive Placement agreement and wire instructions for a $5,000 underwriting fee to this email. Waterfall was the fund to which Pacific intended to take Ridgeland's project.

Ridgeland had a policy that it would not pay an upfront fee, but would rather pay for performance. From 2006 through its introduction to Pacific in 2014, it had never paid an upfront fee to anyone who promised he or she could provide financing. According to Farris, before Ridgeland entered into the placement agreement with Pacific and paid Pacific $5,000, Pacific represented that the fund could close the transaction immediately. Elfsten and Hasegawa denying making these representations.

Farris also states that Pacific did not tell Ridgeland that Waterfall did not currently have the money available to finance Ridgeland's project, or that it need to obtain a new loan before it funded any projects. Elfsten and Hasegawa state in their affidavits that they were told by Waterfall that it had funds available for Ridgeland and Pacific's clients, and that Pacific lacked any internal information about Waterfall.

Waterfall did not own property near Ridgeland's project in Wyoming.

Ridgeland also reviewed the list of transactions, including closings, on Pacific's website and relied on its representations of a successful track record of closing large transactions. In reliance on Pacific's representations and omissions, on March 24, 2014, Ridgeland entered into a Non-Exclusive Placement and Fee Agreement whereby Pacific agreed to be Ridgeland's agent and use its best efforts to find funding for Ridgeland's project. The agreement required Ridgeland to pay Pacific a non-refundable underwriting fee of $5,000, which Ridgeland sent by interstate wire transfer to Pacific. The agreement also provided for a success fee of 3% of funding obtained.

On March 31, 2014, Ridgeland emailed Pacific to ask if everything had been submitted to Waterfall. Hasegawa responded that everything had been submitted, the feedback had been very positive, and "we just have to wait for their analyst to get to the file and begin their internal underwriting."

On April 10, 2014, Ridgeland emailed Pacific and asked for a status update and what it should be working on to move forward. Later that day Hasegawa responded and stated that Waterfall was closing its "next round of bonds" soon, and referenced "past projects we have done with Waterfall." However, Waterfall had not funded other projects with Pacific, and it was not soon to close on any bonds. Those representations were material to Farris and Ridgeland would not have entered into the placement agreement and paid Pacific $5,000 if Pacific had not done other transactions with the fund.

It is uncontroverted that — notwithstanding Pacific's explicit reference to "past projects we have done with Waterfall" — that company had previously failed to follow through on any investment, and it is uncontroverted that Pacific failed to disclose it had never obtained funding through Waterfall. Pacific represented that Waterfall had already looked at and approved the project, that it was basically a done deal, and that Pacific had other backup plans to fund the project if the fund could not for some reason.

Hasegawa's email was the first time that Ridgeland learned Waterfall did not have monies readily available to invest in its project or that it needed to close a bond transaction.

On April 29, 2014, Ridgeland emailed Pacific and asked for an update as to the status of "Waterfall closing on the next round of bonds or other opportunities to get on a conference call or face-to-face meeting" because Ridgeland was under the impression that its project would be funded quickly. Hasegawa responded: "Yes, we are told that they are supposed to be closing the bonds around the 19th of May and they will be setting meetings as soon as they finish that. Things are going well as they really like your project and backgrounds."

On May 22, 2014, Ridgeland emailed Pacific to check on the status of Waterfall closing on the bonds and to determine if they had heard anything from any other potential funding sources. Hasegawa responded that "Everything is going great with Waterfall Mountain. They had some delays but we are told they should be closing on

their bonds by the end of the month." Hasegawa's email also stated that Waterfall remained the best source for Ridgeland's project.

On June 5, 2014, Ridgeland emailed Pacific for an update concerning Waterfall's bond closing and to set up a meeting with Waterfall. Hasegawa responded that Waterfall should have its "money in a few days and [is] prioritizing the projects [it has] to finish underwriting. Expect we'll be doing a conference call with you, Gary and the fund manager Bill [Mournes] next week."

Ridgeland took significant steps in reliance on Pacific's representations that Waterfall would fund Ridgeland's project in the immediate future, including hiring additional employees (including geologists and geophysicists), leasing and moving into new office space, obtaining additional tools for analysis of wells and areas, and entering into additional oil and gas leases. Ridgeland also lessened its efforts to find other funding sources to get ready to proceed when Waterfall provided the promised funding.

Ridgeland met with Bob Bench of Waterfall in Provo, Utah to discuss Ridgeland's project before August 2014. During this discussion, Bench led Ridgeland to believe that the closing of Waterfall's bond transaction was imminent and that Ridgeland's project would be funded as soon as Waterfall's bond transaction closed.

On August 1, 2014, Ridgeland emailed Pacific that it understood Waterfall was still waiting to close on its funding, and asked whether Pacific had any other group to which it could introduce Ridgeland. Hasegawa told Farris that Pacific had "gone to other sources like BG of Canada and the Kuwaitis, but they passed." He explained that "[w]e

are very confident Waterfall will be a great partner for you." While it was still waiting to close on its bonds,

> the good news is that is supposed to happen by the 15th of August. They like your project and team more than you may realize and are planning on doing not only the initial project presented by much more with you immediately. They are hoping you will be a long term member of their team.

> We have many sources but we feel Waterfall is the best fit, especially from the feedback we got from Bob. A lot of things are supposed to happen in the next few weeks including closing on their bonds, so we would like everyone to sit tight for two weeks before we go anywhere else, as we suspect the momentum will pick up very shortly.

On October 2, 2014, Bench emailed Ridgeland that he hoped to have verifiable confirmation of Mournes and Duval's travel plans for closing activities for Waterfall's funding by the middle of the following week. One week later, Ridgeland emailed Bench to ask about the funds, because it had opportunities lined up and ready to go. Bench responded that he would try to schedule a conference with Mournes the fund manager and that he thought they had positive news of possible timing. A call was never scheduled.

On December 4, 2014, Ridgeland emailed Bench and stated that it had not heard anything from him for nearly two months and it therefore assumed the deal was dead. Bench responded that Waterfall's funding was still on track, but moving much slower than it would like and the very best view he had was that the funding was expected to occur before Christmas. Bench stated that Ridgeland's project was still high on its priority

list and he would advise Ridgeland when Waterfall passed the closing gate. Ridgeland

has not spoken with anyone associated with Waterfall since December 4, 2014.

The same day, Ridgeland emailed Hasegawa and Elfsten:

We have not heard anything from Waterfall for 2 months and have not had any signs that they can actually close their side of the deal for months now (since we began talking with them). They were sure that everything would close and fund by end of May (then June, July, etc.) but nothing concrete has happened as far as we know.
What are other options? . . .

Hasegawa responded by asking to schedule a conference call the following day.

This conference call never occurred.

Ridgeland ceased its operations in December 2014, closed its office, laid off its

employees, defaulted on certain oil and gas leases, and defaulted on the lease for its office.

Ridgeland lost more than $150,000 because it relied on the suggestion that Waterfall

would fund Ridgeland's project immediately.

Pacific afterwards misrepresented on its website that it had obtained a

commitment to fund Ridgeland's project.

Pacific never showed Ridgeland any documents showing that it had indeed

pitched the project to BG Canada or "the Kuwaitis" or any potential financier other than

Waterfall.

**Frogville**

Richard Dyer, the owner of Frogville Exploration & Development, came into contact with Pacific while seeking a joint venture partner to help finance developing an oil and gas field. Dyer spoke with Elfsten by phone in May 2014, and Elfsten said that Pacific had connections with a fund that could provide the funding requested by Frogville in the short term. According to Dyer, Elfsten represented that he was extremely close with the fund manager, and led Dyer to believe that the funding was coming from a package of funding secured by bonds. Elfsten and Hasegawa represented that Pacific would introduce Frogville to the fund and assist in facilitating the transaction if Frogville paid $5,000.

In his affidavit, Elfsten denies making these representations. He further states that he "used to train numerous operatives at Camp Pendleton in the 1980's and was told by Bill Mournes that Mournes was one of the trainees. I do not remember meeting Mournes at that time." He denies telling Dyer that he was "extremely close with Bill Mournes," and only told Dyer and other clients that Mournes was one of "numerous operatives I trained at Camp Pendleton." However, this attempt to distance himself from Mournes is contradicted by an email sent by Elfsten, after the present action began, in which he stresses that he had reviewed his e-mails with clients and stresses that none "talk about doing prior transactions with Bill Mournes" — while at the same time acknowledging that "[v]erbally" he had told clients "that I have known Bill Mournes for 30 years and have been involved in prior transactions."

Frogville executed the agreement on May 22, 2014 to retain Pacific to act as its agent to use best efforts to locate funding for Frogville's project and paid Pacific $5,000. Dyer has testified that he acted in in reliance on Elfsten's representations that Pacific had a group with the ability to provide necessary financing for Frogville's project in the immediate future. He was not told Waterfall's ability to provide funding was contingent. Had he known this information, Frogville would not have paid Pacific the $5,000.

On May 29, 2014, Jeff Anderson, a former member of Frogville, emailed Hasegawa to ask for more information about Waterfall. Hasegawa responded:

> The fund is Waterfall Mountain, LLC out of American Fork, UT. I'm not sure what else needs to be said about them, beyond what Chuck [Elfsten] has already extensively told you. Perhaps we can have another phone call next week to go over it again. We are actually very busy right now lining up projects (including yours) for the fund's first allocation of bonds that were just put in their name.

Waterfall did not fund Frogville's project and Pacific did not locate a different source of funding for Frogville.

**Stamper Energy**

In 2014, David Stamper of Stamper Energy was seeking a $10,000,000 joint venture partner to provide funding to purchase oil and gas leases in Oklahoma. According to Stamper, he was introduced to Pacific and had an initial telephone call with Elfsten. Stamper told Elfsten he needed funding to buy these leases in 90 days, and Elfsten responded that Waterfall had a fund that would be interested in the project, that the fund

had millions of dollars available to invest and could fund the project within 90 days, and that Pacific had done other successful projects with the fund in the past. Stamper was not told that the fund had to get a loan to generate monies to invest.

On August 15, 2014, Stamper sent Elfsten an email containing several questions, including:

3. A deeper explanation on why you say that you actually get 5 pts. forever.

4. I have concerns over the deal structure, are there possible other structures that work for the fund?

5. I understand you don't want to waste time with tire kickers so you charge a nominal fee of 5k for underwriting. I have been burned recently doing that [very] commitment for a larger fee with a reputable brokerage. We have money in the deals and are not tire kickers. If [you are] 90% sure [you are] making 400+k in 6 weeks or less what is 5k today?

Elfsten responded:

Why don't you look at our responses below, but it sounds like you are not interested in using our services. If that is incorrect, give me a call Monday after you've looked at our responses and discussed it with your partners if needed.

. . . .

3. We will actually be servicing your project and will be involved with you as long as you are doing projects with the fund. . .

4. Your deal structure is negotiable with the fund after they approve your transactions. It can be done in numerous formats including giving them their money first which was not addressed in the structure I gave you.

5. The fund requires us to charge a $5,000 underwriting/processing fee after they've had their initial look and determined they are interested, which they have done. This is only a part of the actual costs but it somewhat separates the men from the boys.

On August 19, 2014, Hasegawa emailed Stamper:

Per your request, attached are redacted agreements used by the fund on past projects: a term sheet, a stock purchase agreement and a joint participation drilling agreement.

Please keep these extremely confidential as we normally don't give these out ahead of time. As we mentioned, the fund agreements for your project may be significantly different.

The documents attached included agreements to which Waterfall was a party that represented Waterfall provided tens of millions in financing for past projects with which Pacific was affiliated.

On September 16, 2014, Stamper Energy entered into a Non-Exclusive Placement and Fee Agreement with Pacific to retain Pacific to use its best efforts to locate a joint venture partner or equity investor, in exchange for a $5,000 underwriting/processing fee. Stamper entered into the Non-Exclusive Placement and Fee Agreement and paid the $5,000 in reliance on Elfsten and Hasegawa's representations that Pacific had a fund that could provide $10,000,000 in funding, that the fund was interested in Stamper Energy's project, that Pacific had done other successful transactions with the fund, and that the fund had monies available and had the ability to provide the monies within Stamper's 90 day window. Stamper was not told that Waterfall failed to fund other projects Pacific represented. Had Stamper known this, he would not have entered into the placement agreement and paid the $5,000. Similarly, he would not have paid Pacific without the representations that Pacific had completed other deals with Waterfall.

According to Stamper, he later spoke twice with Mournes of Waterfall. Mournes told Stamper that Waterfall had funding available and there was no suggestion that Waterfall did not have monies available at that time. However, after the second call with Mournes, the transaction did not progress further, and Waterfall did not fund Stamper's project. In January 2015, Stamper asked Pacific to refund the $5,000. Pacific refused.

Again, Elfsten and Hasegawa dispute these contentions. According to them, they did not tell Stamper that Waterfall had current funding available, and did not guarantee any funding. Elfsten states that while he told Stamper he had worked with Waterfall in the past, he did not represent that any particular funding project had been successful. When Hasegawa identified "agreements used by the fund on past projects," Pacific claims in its Response (Dkt. 308 ¶ 84), he was simply referring to proposed, rather than completed agreements. But, under the circumstances of the case, this claim lacks any substance. The clear import of the client's inquiry was to hear of prior successful transaction — why else would clients pay Pacific the nonrefundable fee it demanded?

**Ocean Grove**

On March 18, 2015, Pacific entered into a Non-Exclusive Placement Agreement with Ocean Grove and charged it $3,750. Pacific introduced it to Waterfall as an intended funding source. Waterfall entered into a Letter of Intent with Ocean Grove on May 29, 2015.

On June 2, 2015, Elfsten wrote to Brian Barbuto:

Pursuant to our recent discussion, I am writing to provide additional clarification regarding the anticipated funding of the Ocean Grove Hotel and Apartment Project as outlined in the Letter of Intent (LOI) dated May 29, 2015, from Waterfall International Holdings Limited.

It is understood that time is of the essence in this transaction and we can confirm that due diligence and underwriting are substantially completed at this time. In addition, we expect Waterfall Mountain to instruct its legal counsel to proceed with preparation of definitive agreements documenting the various project funding phases described in the LOI.

In consideration of the above, as of today's date, we anticipate the following:

1. Funding of the initial equity of $7 million will complete within 40 days.

2. Funding of the second round of equity of $5 million will complete within 45-60 days.

3. Funding of the construction loan of $27.2 million will close within 90 days.

Waterfall did not fund the Ocean Grove project.

**Hussey Oil and Gas**

Jim Hussey, a petroleum engineer with an extensive history in the oil and gas industry, owns and operates Hussey Oil & Gas. In general, Hussey obtains oil and gas leases and seeks investors to develop the projects.

In October 2015, Hussey was seeking millions of dollars in financing to develop an oil and gas lease in Nevada. The lease was set to expire at the end of the year unless Hussey began development. An acquaintance suggested Hussey contact Pacific. Hussey

then contacted Elfsten to arrange a meeting. Hussey met with Elfsten at Pacific's office in California on November 2, 2015. Hussey made Pacific aware of the approaching deadline to commence development of the lease.

Hussey avers that Pacific told him it had a fund ran by Mournes that had the ability to fund Hussey's project immediately and save the lease. Pacific represented that it had done other successful deals with Mournes' fund, and Pacific never mentioned any funding source other than Mournes' fund. Elfsten indicated that a geologist familiar with Nevada prospects by the name of Vince Ramirez reviewed Hussey's prospect on behalf of the fund and approved it.

Elfsten and Hasegawa aver that they mentioned other funds, did not say that Waterfall had funds to immediately invest, or that it had successfully worked with Waterfall to obtain funding. According to Elfsten, he only told Hussey that Ramirez was then reviewing the project on behalf of Waterfall.

Pacific did not convey any reservations about its ability to fund Hussey's project within Hussey's deadline.

On November 6, 2015, Hussey executed a Non-Exclusive Placement and Consulting Fee Agreement with Pacific to retain Pacific as an agent, using its best efforts to locate a joint venture partner or equity investor for Hussey's project. The agreement called for Hussey to pay Pacific a $7,600 underwriting/processing fee, which Hussey wire transferred to Pacific that day.

Hussey would not have entered into the agreement or paid the $7,600 but for Pacific's representations concerning Waterfall's ability to fund its project in the immediate future.

Hussey was later given Ramirez's telephone number by a mutual acquaintance. He called Ramirez, who told him that Elfsten did not have the authority to approve projects because projects could only be approved by a vote of the five board members of Mournes' fund. Ramirez also told him that he had never seen Hussey's project. Hussey would not have entered into the agreement but for the representations to Hussey that that Ramirez had reviewed and approved the proposal.

Hasegawa emailed Hussey on November 9, 2015, concerning information to be submitted to the fund. His email states, in part, that "we do this in a simple format because it will be shown at some point to the Fund Director's Chinese partners whose first language is not English."

On Friday, November 20, 2015, Hussey emailed Elfsten and Hasegawa for an update concerning the status of the potential transaction. Elfsten responded that he should have an update the following Monday.

On Monday afternoon, Hussey emailed Elfsten about the status of financing and asked to speak with him the next day. During the Tuesday conversation, Elfsten represented that the funding process was moving along and funding should be available in the near future.

On December 1, 2015, Hussey emailed Elfsten and Hasegawa concerning the status of funding, and explained that he needed "to have funding in place ASAP after January 1, 2016." Hasegawa responded with a copy to Elfsten stating: "We're copying Bill on this e-mail so he sees it. They are proceeding nicely on their closings and we'll set up a meeting with you and Bill this week, probably Thursday if you're available." A call with Mournes was scheduled for Friday, December 4, 2015.

On December 4, Hasegawa emailed Hussey, copying Mournes and Elfsten:

Unfortunately the fund is racing around doing *several closings* and their timing is a little on the crazy side at the moment. We're going to have to reschedule the meeting for some time next week. We've copied Bill on this email.

(Emphasis added). In response to Hasegawa's December 1 email, Hussey asked whether they had a joint venture agreement he could review while waiting for the call. [Id.]. Hasegawa responded that Pacific was not able to do that because "it would be out of sequence with the fund's wishes."

The following week, on Tuesday, December 8, 2015, Hasegawa emailed Hussey with a copy to Elfsten. His email stated that they had been trying to get a hold of Mournes but "they have been busy with several other closings and we haven't heard from him yet, so we're not sure when the meeting will be."

On Friday, December 11, 2015, Hussey emailed Elfsten and Hasegawa. Hasegawa stated that Mournes "has been extremely busy closing several more bonds this week.

We've asked him in a separate e-mail and by copy of this e-mail to have a meeting Monday afternoon but it hasn't been confirmed yet."

Hussey emailed Elfsten and Hasegawa on January 6, 2016 asking to schedule an in-person meeting with Mournes. Hasegawa responded that the "Saudi executions and turmoil has slowed Bill down slightly. We'll know the approximate timing around the end of this week and get back with you."

Hussey emailed again on January 11. Hasegawa responded: "Yes, we spoke with Bill at length on Friday and everything is going well. It appears they will have their funds by the end of the month or mid-February at the latest."

On January 22, 2016, Hussey emailed again. This time, Hasegawa said, "we'll get a better update Monday afternoon, but we are told everything is going good and they should have funds by the end of this month or first week of February." In response to Hussey's February 2, 2016 email, Hasegawa stated: "We're expecting to have an update in the next two days. We're told everything is on schedule but we don't know what that means. When we know, we'll tell you."

In emails on February 5, 9, and 16, Hussey asked for updates. He explained he was concerned they may miss the opportunity to complete the prospect if funding and deal terms were not worked out shortly. Hasegawa responded:

> Thank you for your patience and we understand your concern. From what we're told, Bill should be closing on this round of funding very soon, possible this week despite the extremely low oil prices, which have made things difficult. We'll let you know as soon [as] we get another update from the fund.

Neither Pacific, Waterfall, Mournes, nor any entity associated with them ever provided any funding for Hussey's prospect and Hussey lost the opportunity. Pacific refused to return the $7,600 paid by Hussey, and stresses that the fee is designated as non-refundable in the Agreement.

According to Hussey, Pacific made no efforts to introduce him to any funding sources other than Waterfall. Hasegawa states in his affidavit that he and Elfsten did make some telephone calls to other potential funding sources.

**Solus Oil & Gas**

In late 2015 and early 2016, Solus Oil & Gas was seeking funding for oil and gas projects in Texas. It came into contact with Pacific, by its agents Elfsten and Hasegawa. According to Solus's Parker Jones, he and Adam Perry (Solus's managing member) had multiple telephone calls with Elfsten and Hasegawa about the project, and Elfsten and Hasegawa told them that Pacific had an international fund that could provide funding. The said that the fund owned international bonds that it intended to sell or use to obtain the funding, and did not tell them of any contingencies or restrictions on the bonds. Elfsten and Hasegawa also represented that they had done prior transactions with the fund.

The defendants again cited the declarations of Elfsten and Hasegawa in which they state they told their clients "only that [Pacific] had engaged with Waterfall in prior transactions," not that Pacific had ever "previously funded" anything. (Resp. ¶ 125).

Elfsten and Hasegawa represented that they would introduce Solus to the fund and assist in arranging funding for its transaction. However, Elfsten and Hasegawa required a $7,600 deposit prior to introducing Solus to the fund and required the execution of a Non-Exclusive Placement and Consulting Fee Agreement. In reliance on Pacific's representations, Solus executed the Agreement with Pacific on January 8, 2016, and, on January 14, 2016, it sent Pacific the $7,600 required by the agreement by interstate wire transfer.

Solus was then introduced to Mournes and Waterfall as the intended funding source. Jones had only one conversation with Mournes concerning the potential projects. Jones was later told by Pacific that issues in the global markets slowed the process of the fund converting the bonds to cash. Solus then began to pursue other sources of funding.

Neither Pacific, Elfsten, Hasegawa, Mournes, nor Waterfall ever provided any funding for Solus' project.

**Santa Fe Petroleum**

In 2014 Santa Fe Petroleum was seeking a joint venture partner to provide over 100 million dollars in funding to develop a prospect in East Texas. Bryan Harveston, a senior vice president of Sante Fe spoke by telephone to Elfsten and Hasegawa of Pacific

in September, 2014. According to Harveston, Elfsten told him that Mournes and Waterfall asked him to form Pacific to locate oil and gas projects in which Waterfall could invest.

Hasegawa disputes this contention, stating that Pacific was created in 2012, and the company was introduced to Waterfall in 2013.

On September 29, 2014, Hasegawa sent Harveston a Non-Exclusive Placement Agreement for review to retain Pacific to locate funding for Santa Fe's project along with wire instructions for a $5,000 placement/underwriting fee. The following day, Harveston participated in a conference call with Elfsten. Harveston avers that during this conversation Elfsten told him that Mournes was the fund manager and explained how they had met in the military.

Elfsten has averred "Mournes remembered meeting him in the military," but that he (Elfsten) "never claimed that he independently remembered meeting Mournes or was friends with Mournes while in the military." (Resp. at 133). At the same time, other evidence establishes that Elfsten has told people that he has "known Mournes for 30 years."

Haverston avers that Elfsten told him during the telephone call that Waterfall could fund Santa Fe's project in 60 to 90 days, that Pacific was dedicated to only Waterfall's projects, and that Pacific needed to appear separate from Mournes and Waterfall, but it was not.

Elfsten and Hasegawa state in their declarations that Pacific never promised any funding to Sante Fe, and that Pacific was merely repeating promises made to it by

Waterfall. Elfsten denies telling Haverston that Pacific and Waterfall were not independent.

On October 22, 2014, Elfsten emailed Harveston, asking if their potential agreement was dead. Harveston responded that Santa Fe did not wish to pay upfront fees to brokers due to a previous bad experience, but would like to proceed on a success fee basis. Elfsten replied: "Bryan, unfortunately I am required to charge the underwriting fee as it is a small part of what the fund spends and they also want to see that you are serious."

Santa Fe did not have any contact with Pacific from October 22, 2014, until February 8, 2016, when Harveston emailed Pacific to ask if it was still offering funding programs and whether any changes had been made to their format due to the changes in the oil markets. Elfsten responded "yes we are still dealing with the same fund and offering the same programs." Harveston then asked whether Pacific would consider working on a success fee basis. Elfsten responded:

> We're not any different from before, *even though we're independent, we're basically working for this fund* since they're spending $30,000-$35,000 for legal fees, geology, site visits, etc. they don't let us take on any clients that are unwilling or unable to pay a small underwriting/processing fee of $7,600. You asked this before and the answer is the same.
>
> We are still one of the only games in town.

(Emphasis added.)

Harveston continued to exchange emails with Elfsten concerning the fund and increased fee, including asking how many transactions Pacific had closed with its funding source in 2015. Elfsten replied:

> We have eight funds that we work with. One in particular that we like the best is extremely private and we cannot go over what we close with you but suffice it to say, *we have an over 95% success rate.* We do have slightly over $1.5 billion we plan on closing with them this first quarter.
>
> The fund is not like a hedge fund that says here is your approval and now wire us $180,000. The actual cost paid to the fund other than this $7,600 to us is zero. There are fees that are minimal that will be incurred…. There will be site visits where you will have to meet the fund on site which will cost you to travel there, although the fund does not charge you for them to fly to your project and there will also be a visit to meet the fund either Newport Beach or Salt Lake City.
>
> There will be joint venture agreements you will have to pay and [sic] attorney to look at. To date those are [sic] agreements are 9 to 14 pages and are so simple a 3rd grade drop out could understand them; however, even though the fund is private, they will follow SEC rules, so it will be required for you to hire an attorney to review the agreement with your group. These are minimal costs and from past experience we know they add up to between $5,000 and $7,000.

(Emphasis added.)

In continued email discussions about the $7,600 processing fee, Harveston asked Elfsten to provide references with others they had transacted business with recently. References were never provided. Pacific contends that it keeps its client information confidential as a matter of practice.

On February 17, 2016, Harveston emailed Hasegawa and Elfsten, asking, if Santa Fe signed the agreement and paid the $7,600 by the following Monday, how long the

35

turnaround "typically is" to receive the first round of funding. Hasegawa sent Harveston another draft of Placement Agreement and said, "It will take us until the end of February to do all the underwriting that is required by the fund. If we're lucky, 45 days from the beginning of March, if we're not lucky, 2 months."

Later on February 17, 2016, Harveston emailed Hasegawa and Elfsten and asked for an underwriting list to consider to make sure Santa Fe would be successful in qualifying before it paid the $7,600 fee. Hasegawa responded to the email, with a copy to Elfsten, and stated:

> No, we've already gone through our internal process and are comfortable you will qualify or we wouldn't have drawn up the fee agreement. We also already gave you a list of things we'll need for the underwriting package in a previous email ….

Harveston states in his affidavit that he was left with the impression that if he signed the agreement with PNC funding was almost certain in 60 days. The defendants contend that Pacific did not make any express guaranty of funding from Waterfall.

On March 2, 2016, Santa Fe entered into the Placement Agreement and paid Pacific the required $7,600 fee, and Pacific agreed to act as Sante Fe's agent and use its best efforts to locate funding. Sante Fe relied upon Pacific's alleged 95% success rate with Waterfall, the suggestion that its project was approved, and the suggestion that (at the worst) Waterfall could fund in 60 days. Similarly, Sante Fe relied on the absence of negative information about Waterfall – it would not have entered into the Agreement had it known that Waterfall had not been able to fund other projects, that its source of funding was

36

contingent on it obtaining a new loan, that a bank in Venezuela had to approve Waterfall's intended transaction, that it had not successfully closed the transaction to obtain monies despite multiple prior efforts, or that Waterfall and Mournes had defaulted on millions of dollars of promissory notes.

Harveston states he participated in a conference call with Elfsten and Mournes on March 24, 2016 in which it was represented that Elfsten screens out 95% of the oil and gas projects Pacific reviews. This is the only conversation Harveston had with Mournes. When Mournes and Elfsten stated that the funding was coming from a loan against bonds, it was the first time Harveston learned of the intended source of Waterfall's funding. They also mentioned Zouvas as an engineer associated with Waterfall.

According to the defendants, Elfsten "does not remember" making the 95% claim. Elfsten states that Zouvas was identified as a Waterfall associate, but not an engineer.

On March 28, 2016, Harveston emailed Hasegawa in an attempt to schedule a conference call with Waterfall. Hasegawa emailed Harveston with a copy to Elfsten: "Timing is changing as they are traveling to Dubai this week to close on large round of funding. We'll let you know as soon as we can have the conference call with Bill's technical people." It is Harveston's understanding that Duval was purportedly traveling to Dubai to close the round of funding for Waterfall.

Pacific again responds by stating that it was simply repeating what Waterfall was telling it.

Harveston emailed Hasegawa and Elfsten on April 4, 2016, requesting a schedule update. He was told there was a temporary delay. Harveston emailed on April 11, and was told that a call with Mournes had been delayed. On April 20, he was told that funding was delayed.

Harveston would typically only get a status update if he reached out to Hasegawa and Elfsten. They did not always respond, and when they did the response was always that funding was delayed. In addition to the emails set forth herein, Harveston would call for updates as well. Most of the updates were actually provided over the phone.

On April 25, 2016, Harveston emailed Hasegawa and Elfsten and asked if Mournes and Duval had made it back from Dubai and wrapped up the bond finance program. On May 26, 2016, Hasegawa emailed Harveston with a copy to Elfsten and stated:

> Got your message. We haven't received an update from Bill yet like we were hoping. From what we understand, Bill is in Utah today and he and his team members are extremely busy working on the closing….

On June 17, 2016, Hasegawa emailed Harveston with a copy to Elfsten and stated: "Bill is busy preparing to leave beginning of next week and is not available for a call but we'll try to have a conversation with him over the weekend…."

On July 22, 2016, Hasegawa emailed Harveston with a copy to Elfsten and stated: "Spoke to Bill and was told he is supposed to be traveling to close around the middle of next week."

On August 1, 2016, Harveston emailed Hasegawa and asked what attorney they would be working with to prepare the final agreements. Hasegawa responded that they

had several and that "will happen after they get back." Harveston asked if there was any update on Mournes's progress that week.

An August 5, 2016, Hasegawa emailed Harveston with a copy to Elfsten and stated: "Bryan, got your message earlier. We're told they're making good progress, not sure of the exact timing yet."

Harveston's emails to Hasegawa (with copies to Elfsten) continued into the fall of 2016. On August 25, he asked if Hasegawa could arrange a call for him to talk directly to Mournes. Hasegawa responded:

> Bill is in the process of closing his bonds and is not available for contact at the moment. We believe he'll be available sometime end of next week and we'll communicate that to you; however, if all you want to do is push him for the timing of the money, I would say that's ill advised as they are closing their transaction and working on all the projects as we speak.

On September 7, Harveston asked if there were any new updates and whether Mournes was still on track for September 12. On September 13, he asked if there was any updates about Mournes closing on the bond funds. On September 14, Hasegawa emailed: "I just spoke with Bryan. We're told the fund is getting close, but we don't know the exact timing. Everyone is doing whatever they can to get to get [sic] to the finish line." In response to an October 24 inquiry, Hasegawa wrote: "We got a brief update from Bill today and they are still looking to close on their bonds somewhere by the end of the month or the first week of November."

On November 17, 2016, Tom Griffin of Sante Fe emailed Hasegawa with a copy to Harveston concerning the potential to acquire sizeable acreage for a different prospect,

and asked him to pass information along to Mournes and Elfsten. Hasegawa responded that day with a copy to Harveston and Elfsten stating, in part: "I just spoke to Bryan. The fund has made a lot of progress and should be closing on their bonds somewhere the end of the month."

On December 29, 2016, Hasegawa responded to an email from Tom Griffin: "yes to our knowledge it's still on track [to receive funds by January 8, 2017]."

This pattern continued into 2017. On January 12, Griffin email Hasegawa with a copy to Harveston and asked if Hasegawa had an update from Mournes. Hasegawa responded: "We're supposed to get an update tomorrow. We know they're close, but we don't know the timing."

On January 16, 2017 Tom Griffin emailed Hasegawa for an update from Mournes because he understood the transaction was to have closed the preceding week. Hasegawa replied: "The fund is getting very close but is taking longer than anyone would like. We understand it should be totally closed in about a week, which is what we're told."

On September 22, 2017, Harveston called Hasegawa for an update. Hasegawa emailed Harveston with a copy to Elfsten stating:

> Len said you called today when I was on a conference call. One of the meetings I had today was with Bill and the latest update he told us is that he is planning to be in Utah to coordinate with his team next week and will be in Dubai the first week of October and closing somewhere the week of Oct. 9th.

On June 1, 2018, Harveston emailed Hasegawa to inquire as to whether he had an update from Mournes. Hasegawa responded that day stating:

Yes, we spoke to Bill yesterday evening and got a good update. There was a delay as they had to get their bond portfolio re-certified by the treasury dept. to verify they weren't subject to any recent sanctions. They did get that verification and should be closing their bonds somewhere the week of the June 11th.

On June 30, 2018, Harveston emailed Hasegawa and requested an update because he was unable to reach him by phone the day before. Hasegawa responded:

Bryan, we spoke briefly to Bill this morning. He is supposed to be in Utah Monday to prepare for the closing. He was planning to be there this past Wednesday, so his schedule got pushed back slightly, but things appear to be on track.

Harveston estimates that he contacted Hasegawa at least 100 times since June 2018, and each time he was told that the closing had been delayed for one reason or another.

In April 2018, Elfsten contacted Harveston searching for other projects to place with Waterfall because they had lost the opportunity to fund projects because of the purported delay in Waterfall receiving its funding.

Pacific attempts to dispute this fact, but the cited portion of Elfsten's declaration states merely that he does not remember such a call, not that it did not happen.

**Calx**

Lorne Onstad was the President of Calx, Ltd., a Canadian corporation, which in 2016 was looking for a joint venture partner to provide approximately $4 million in funding to expand its operations to Oman and the United States. Calx came into contact

with Pacific in or around March of 2016, with Pacific acting through its agents Elfsten and Hasegawa.

According to Onstad's affidavit, he participated in a March 2016 conference call with Hasegawa and Elfsten. During the conversation, Pacific represented that it had a fund that it had worked with in the past that would be interested and had the ability to provide the funding for Calx's project. Pacific asked for a deposit of $7,600 and for documentation explaining Calx's project, and in exchange Pacific agreed to put on a presentation to the fund. Even though Calx was only looking for $ 4 million it was suggested that it should be looking for $ 20 million and to vastly increase the scope of the project.

Elfsten denies promising Calx that any of its potential financers "had the ability to provide the funding" needed by Calx.

In reliance on Pacific's representations that it had a group with the ability to provide necessary funding for Calx's project, Calx executed the Non-Exclusive Placement Agreement on March 31, 2016, which required Calx to make a $7,600 payment. On or about April 4, 2016, Calx submitted a document titled "Use of Funds" which explained Calx's proposal.

According to Onstad, Pacific informed Calx on April 10, 2016, that Pacific's group approved of the project. Six days later, Calx sent Pacific the $7,600 payment by wire.

After Calx wired Pacific the $7,600, Pacific introduced it to Waterfall as the group that would fund the project. Waterfall acted through Mournes.

Pacific represented that it had done other transactions with Mournes and Waterfall, and that Waterfall would be securing funding from China in the near future and would have the ability to enter into a transaction with Calx.

Over the following months, Pacific and Waterfall represented that the funding had not come through yet, but would in the immediate future. Due to suspicions that the funding would not be coming as promised, Calx asked Pacific if there were other investors that would be interested in the project. Pacific told Calx that Calx had to see it through with Waterfall.

Waterfall never provided any funding for Calx's project.


## Windy Butte

On March 2, 2016, Waterfall provided a letter of intent to Kim Harris of Windy Butte, LLC. The letter stated that Waterfall would make capital contributions of up to $ 6 million, and would help in getting additional funding as needed. Waterfall offered to pay Windy Butte a break-up fee of $350,000 if Waterfall failed to fund its project by April 15, 2016, predicated on Waterfall receiving funding from bonds. Waterfall also provided Windy Butte a draft promissory note for $350,000

On March 30, 2016, Waterfall Mountain International Holdings Limited and Mournes entered into a promissory note with Kim Harris of Windy Butte in the principal amount of $100,000. The note required Waterfall Mountain International Holdings Limited and Mournes to pay the sum of $200,000 on April 30, 2016.

Mournes and Waterfall Mountain International Holdings Limited have failed to pay the amounts due to Windy Butte under the terms of the promissory note.

**The Watchous Project**

In 2016, Watchous wanted to find an equity partner or lender to replace its existing lender and fund its drilling operation. Watchous located Pacific on the internet and submitted information on its website concerning its funding needs. Nick Gerstner of Watchous spoke with Hasegawa on or about May 31, 2016, and sent information about Watchous's financial position.

Hasegawa responded, in part:

You're to be congratulated, your company looks extremely good to us and we can see why you probably would not want to do a joint venture on existing income as you would lose too much. Your cost per well at $312,000 is right in line and your lift costs are not only fantastic, they're right in line with the Saudis.

We would like to work on your line of credit or your joint venture, or both at the same time . . .

According to Gerstner and Klee Watchous, during an early telephone call with Elfsten and Hasegawa, the latter stated that Pacific had done other successful transactions with its fund and that its fund had the ability to fund Watchous' proposed joint venture in the immediate future.

Again, Elfsten and Hasegawa dispute making such representations, contending that they "never promised" that Waterfall "currently had monies to invest" or that Pacific

had "done prior successful deals." (Dkt. 308 at ¶ 17), but these denials are cursory and fly in the face of the contemporary evidence. The express statement by Elfsten that he had known Mournes for 30 years and was "involved in prior transactions" with him, when made without caveat or qualification and in the context of this case, inevitably suggests to any reasonable person that these were *successful* transactions — or (at the very least) not a relentless series of failures.

Hasegawa emailed Gerstner on June 1, 2016:

The joint venture agreement is open ended as it will be for whatever your company and the fund agree to and we put in 10 years and 3 points and a $7,600 for the underwriting and processing, which will take us a little over a week to do. The 3 points will be advanced by the fund and even though there is termination date of 10 years, we have been told by the fund that as we're working on the projects and are involved, they will pay us. Even though you agree to pay the 3 points in this non-exclusive agreement, again, the fund will advance it and they will pay whatever percentage ownership they have, you pay the portion of ownership that you have, so the cost to you will be minimal.

Your joint venture will be perfect for the fund we represent….

In response, Pacific argues that in this email, Hasegawa "does not imply ownership of Waterfall by [Pacific] or any relation of [Pacific] to Waterfall." (Resp. at ¶ 190). The first point does not controvert the alleged fact, the plaintiff does not cite the evidence with the claim that Waterfall said it owned Pacific; the second assertion is simply wrong. Hasegawa told Watchous that Pacific "represent[ed]" Waterfall for joint venture purposes, directly implying something more than an independent corporate relationship.

Two days later, Watchous sent proposals for changes to the proposed agreements with Pacific. Pacific responded that "our fund" may use a new limited liability company, but that Pacific would be involved in the underwriting "for the fund" throughout the process. Although the fund is not explicitly named, in the context of the communications, it is clear that the reference is to the Waterfall fund.

The parties negotiated changes to the agreements. Annexes to the Agreements identified potential joint venture partners or lenders. The potential lenders included PCG (Private Capital Group), Infobrij, IMH Financial, and Monroe Capital. On the afternoon of June 4, 2016, Klee signed the agreements on behalf of Watchous and emailed them to Hasegawa, retaining Pacific as its agent to use its best efforts to find a joint venture partner and lender for Watchous.

On June 6, 2016, Watchous sent $12,600 to Pacific by interstate wire transfer, representing the $7,600 fee called for in the Joint Venture Placement Agreement and the $5,000 fee called for in the Loan Placement Agreement.

Klee executed the Joint Venture Placement Agreement and paid Pacific the $7,600 based on Pacific's representations that it had a fund that had the ability to provide millions of dollars in funding to Watchous.

In their motion for summary judgment, the Pacific defendants allege that they "were excluded" from the negotiations between Watchous and Waterfall as to the Letter of Intent. This is not supported by the facts, which indicate at most that at some points during the process Pacific officers complained they were not informed about particular

communications. But the evidence otherwise establishes that Pacific was closely involved in the negotiations — it kept Waterfall informed of the terms Watchous had received from other financers, and made suggestions about the proposals to make to Watchous.

It is uncontroverted that Pacific did not tell Watchous that Waterfall did not have the monies readily available, had unsuccessfully been attempting to close an obscure international transaction using Venezuelan bonds owned by a foreign bank for years to obtain monies to invest, that the fund had failed to close the transaction despite countless representations that it would, or that the fund had failed to fulfill promises to Pacific's clients concerning funding other projects. All of this information would have been material to Watchous and Watchous would not have entered into the Joint Venture Placement Agreement or paid Pacific the $7,600 if it had known it.

Pacific attempts to dispute this fact by stating that Waterfall had "promised [it] on numerous occasions that it would have funds available imminently [sic]," and thus that the fund "had yet to 'fail.'" (Resp. ¶ 195). But this does not controvert the essence of the plaintiff's fact – that Waterfall had dubious funding at best, and a perfect track record of nonsuccess. This was material information, and Pacific concealed it from the plaintiff.

The Pacific defendants also allege they had no inside relationship to Waterfall, and had "no way of knowing if [the misrepresentations the plaintiff attributes to Waterfall] actually occurred." (Dkt. 294, ¶ 38). There is, however, evidence from which a rational factfinder could easily decide that Pacific and Waterfall had a close, "team" relationship. More importantly, however, even if the Pacific defendants may not have known of the

full extent of Waterfall's misrepresentations, they had first hand experience with Waterfall's record which was unblemished by any success. They failed to inform their client of this material information.

On June 7, 2016, Mark Hasegawa sent Klee and Watchous staff, with a copy to Elfsten, the Joint Venture Placement Agreement with only one potential joint-venture partner listed on the Annex, Waterfall.

> [W]e have attached the joint venture agreement with Annex A filled out. As I have explained, this private fund/holding company formed off shore in Ireland for tax purposes, bringing in about $10 billion a year. We are not putting them on our list of 3 lenders for the line of credit, but we are going to have a conversation with them this week to see if they would consider a short term loan to buy you time, even though they typically only do joint ventures or equity.

The next day, Pacific added Beal Bank and two other companies as potential lenders to the annex to the Loan Placement Agreement.

On the same day, Klee emailed Hasegawa with certain financial information Hasegawa had requested. The email also referenced an opportunity for Klee's drilling company, WW Drilling, to purchase drilling rigs and a yard in Oklahoma for $6,000,000.

> In response to this email, Hasegawa stated, in part:

> Thanks for the e-mail, we're also excited to move forward as quickly as possible. I'll look for Jake's email. We believe our joint venture fund would have no problem partnering with you on rig purchasing and splitting the profits.

> Could we please send an e-mail confirming that we have permission to go to the three lenders mentioned ... for the line of credit, and the Irish fund we represent (Waterfall Mountain Group) for the joint venture….

Watchous and Pacific exchanged additional emails concerning potential lenders for Watchous and Watchous' financials.

On June 24, 2016, Hasegawa stated in an email to Watchous with a copy to Elfsten that: "The irony of this private money loan is we believe we can pay the whole thing off with our joint venture partner, in effect almost getting the money for free."

On June 26, 2016, Klee emailed Hasegawa and Elfsten concerning Watchous' willingness to meet with potential lenders. Klee wrote that Watchous "would like to see where we stand with the joint venture deal as other companies have expressed interest in buying our production." Hasegawa responded the next day by stating that the first goal was to close the hard money loan, because "we're thinking the joint venture (our fund) takes out the hard money loan making it somewhat painless and we believe they'd do that." Hasegawa later followed up by asking what Watchous would want for a 50/50 joint venture, explaining: "Our fund will also want detailed resumes for yourself, Nick and any other of the main principles [sic] involved in the day-to-day operations."

On July 11, 2016, Beal Bank was added to Annex A of the Joint Venture Placement Agreement, and on July 13, Arena Investors was added. On July 14, 2016, Hasegawa emailed Watchous about the first pass of proposed sources and uses of funds for the joint venture because he and Elfsten wanted to get it "out to our fund, Waterfall Mountain and Arena Investors ASAP."

On July 17, 2016, Watchous sent Elfsten and Hasegawa additional information concerning the proposed joint venture and its thoughts. Elfsten replied it was a good start

and that Pacific should have Beal Bank's first offer concerning a potential loan that day.
Klee then asked Elfsten his thoughts on Beal Bank and he responded: "They might be
your best and cheapest free (Interest rate only) JV even tho[ugh] our JV would be great."

> Hasegawa emailed Watchous on July 18:

> Looking at the sources and uses and knowing the fund, if they were to put
> up $82 million for a return of $4 million a year, it won't make any sense. We
> need to do a projection of what the new drilling of wells will produce and
> show that additional income.

In an email later that day, Hasegawa stated: "FYI, our fund is closing on two more bonds
this month worth $2.4 billion so we will have options." In context, the references to
"knowing the fund" and "our fund" can only be taken to mean Waterfall – the firm that
Pacific "represent[ed]."

> On July 19, 2016, Hasegawa emailed Watchous about a possible $45 million line of
credit offer by Beal Bank. He wrote:

> As a separate note, Chuck and I just talked to *our fund manager* Bill and we
> were laying out different options of how to do the joint venture quickly. He
> liked the idea and could probably fund not the whole thing, but a big part
> of it from funds he has coming the end of this month, which could be good
> timing. We're working on the package and he said to get it to him by Friday
> which we will do.

(Emphasis added.)

> Hasegawa emailed Klee the next day expressing reservations about the Beal offer.
But on the same day, Hasegawa sent Mournes an email indicating the close relationship
between Pacific and Waterfall, and that Pacific had reason to know that Waterfall's access
to funds was limited:

We'll try to have the Palomino joint venture to you later today. It is extremely juicy and is very negotiable, whatever is fair. We laid it out where if you gave them about $100 million it would be all gotten back within 5 years with just a 50/50 return. We could make a higher return and drop the amount way down and they have about 300 sites they can drill that are all shallow about 2,300 ft deep. You'll see the write-up from Mark later today and we'll make sure we send it to Mark Zouvas. We have some competition from Beal bank offering them $45 million at 7% and $12 million for drilling at 7% but they kind of want their right and left nut for it and I think you can make them a better offer and they like the idea of having a money partner and they are extremely experienced with a lot of equity. This could probably be locked up for $10 million cash now and a promise for future cash off the next bonds and a 80/20 payout until you get your money back as long as they have enough money to live.

Hope things are going better for you today, wish we had the money to help you. As you know, we're a little on the tight side.

On Thursday, July 21, 2016, Gerstner had a conference call with Hasegawa to discuss Beal Bank's terms, including reservations as to its terms and the amount of security requested.

On Monday July 25, Hasegawa emailed Mournes (with cc to Elfsten), asking him to review a draft email to Watchous. This draft said that Elfsten and Hasegawa had just spoken to Mournes, and that Waterfall was in agreement to do an $80 million dollar joint venture, excluding from the security Klee's personal residence and property. The draft asked Watchous put up $175,000 (to be paid back on August 14, 2016) to put Watchous at the top of Mournes' list and delay another joint venture partner.

Mournes responded "Go with it." The draft email was finalized and sent to Watchous that evening, along with a request to schedule a conference call the next morning to talk about the Beal offer, and a call in the afternoon to talk to Mournes. Zouvas

also sent Watchous an email concerning potential deal structure for the joint venture, which stated:

> Typically we would enter into a detailed MOU or term sheet (also attached), which would outline capital allocations, timing sensitivities, title, security provisions, operational responsibility, management oversight and JV ownership rights. Definitive documents would then be drafted base[d] on that data, and we would use elements of older deals as templates. No two deals are the same, but this is representative of the type of deal we would structure.

The agreements attached reflected a multimillion dollar transaction involving Waterfall and Hangtown Energy, Inc., implicitly but inherently suggesting that Waterfall had closed on a prior funding transaction.

On July 26, Zouvas of Waterfall sent Elfsten, Hasegawa, and Mournes a draft of a letter of intent to Watchous dated May 29, 2015, under which Watchous would pay a $175,000 commitment fee to Waterfall by July 27, 2016; it set out proposed terms of Waterfall funding Watchous' projects, and stated that no binding obligation was intended to be created on the part of either party. Later that day, Elfsten emailed Mournes that "this will blow it out of the water. Mark H is redoing it in a format that they will sign. Mark Z didn't read our page?" He emailed again shortly afterwards that "they think they have a commitment."

Later that day, Zouvas emailed Elfsten, Hasegawa, and Mournes concerning the status of the draft letter of intent and attaching a letter on Waterfall's letterhead, including instruction to wire the commitment fee to Magnolia Hill Resources, LLC, an entity

associated with Zouvas. Hasegawa then emailed Mournes, Duval, Zouvas, and Elfsten a revised draft of the letter of intent, which stated:

> Chuck and I have re-done the letter that Mark Zouvas prepared and revised it to include we believe all of the items that were told to the potential JV partners in the form that was explained to them via Bill and our conversation with the two principles [sic] and their CPA. We believe we have this pretty close to correct and Gordon, if you insert your own wire instructions, we believe they will sign it tonight and wire the funds tomorrow morning ….

> If any revisions are needed to be made, we can do it easily … and we would like to [sic] opportunity to send it off ourselves as we have a very good relationship with the principles [sic] …

The draft letter of intent called for return of the $175,000 on or before August 17, 2016.

This draft was signed by Mournes and sent to Watchous with instructions to sign the same and wire the $175,000 to Waterfall's attorney's trust account in Utah.

Zouvas emailed Elfsten, Duval, Hasegawa, and Mournes complaining that Elfsten of Pacific applied Mournes' signature to the letter without his approval. Elfsten responded:

> Of course we got Bill's approval to use the same signature you gave us when you told us Gordon was irresponsible and not to use his wire but to use yours which is totally different than *what we were told to do.*

> You need to have a conversation with Bill and maybe Gordon. *We know what team we're on.*

Although Pacific attempts to dispute the meaning of the email, in context it is clear that Pacific and Waterfall were not acting as independent entities, but as a closely coordinated "team."

Later that evening, Hasegawa emailed Watchous with a list of banks at which Waterfall held accounts, stating that each of the Waterfall entities was active and in good standing with the Utah Secretary of State. Watchous responded that it was interested and that it would like to arrange a meeting with Waterfall in the immediate future. Elfsten responded with suggestions, and apologizing that it took him so long to respond, claiming Mournes was sleeping because he was on "Chinese time."

Klee Watchous flew to New Jersey and met with Mournes on July 27, 2016. According to Klee Watchous, Mournes expressed great interest in Watchous's project and represented that he could fund the proposed joint venture. Mournes said Klee could pick a number for the joint venture because at Watchous's costs everyone could make money. Mournes also represented that Waterfall had the ability to repay the $175,000 with cash.

The Waterfall defendants argue this mischaracterizes what was said at the meeting, "because Mournes represented that Waterfall could fund the proposed venture and repay the $175,000 with cash, only upon closing of the bonds." (Resp., ¶ 219). But this denial overstates the evidence. In the first (¶ 34) of the two cited portions of Mournes's affidavit, he merely states that he has "diligently pursued closing" on the Venezuelan bonds, which he "believed, and still believes, … is imminent." Nothing in the cited portion of the affidavit addresses, let alone refutes, plaintiff's version of what was said at the July 27 meeting. Similarly, the second (¶ 37) does not directly address what was said at the July 27 meeting by Mournes to Klee Watchous, but only indicates generally that

"Waterfall disclosed to Watchous that it would use the $175,000 deposit … to facilitate the closing of the bonds."

But even if Mournes said that was what the deposit would be used for, this does not refute Klee Watchous's averment that Mournes had also said that Waterfall could refund the deposit out of its own cash.

That evening (July 27), Watchous emailed Mournes, Duval, and Zouvas and asked for Waterfall to send it a draft operating agreement, joint venture agreement, loan documents, references, and a management agreement. Mournes forwarded the email to Pacific's Hasegawa and Elfsten. Elfsten responded:

> Just to let you know, since we're the ones that brought the whole project to you and the $175,000, we're taking a little offense that we need to be blind copied when Mark Zouvas, Gordon, etc. are regular copied as we should at least be included in the transaction or all of a sudden it looks like we're second class citizens to the people you're having me negotiate with. Please don't do that.

Mournes responded that it was due to compliance issues. Elfsten then stated:

> Bill, with all respect that is pure Bull Shit. Look at the corrective job we did to fix Mark Z.'s mess yesterday. We are not looking for a lot of respect just a little."

Mournes replied "Not on their part Chuck, trying to check us out."

> Zouvas then emailed Klee Watchous (copying Mournes and Duval);

> Bill asked us to prepare a promissory note that includes a personal guarantee, which I have attached for your and your team's review ….

> As you know, these documents [operating agreement, disclosures, etc.] are very voluminous; are you asking for a draft of the anticipated agreement that would exist between Waterfall and Palomino et. al? we have suites of

documents we have created for other deals, if you're looking for examples, but I do not think it is feasible for us create a full set of documents for an $80 million investment on such short notice.

….

I have also included copies of our bonds, which I ask you keep private and confidential amongst your group (the $900 MM bond is registered in Waterfall's name and the 1.5B bond is registered in the name of our lender, RPB Company, and I have included the assignment for BCV to RPB, FYI). Gordon Duval, our in house counsel, will prepare a reference list for you and submit tomorrow.

The email's references to "our bonds" and documents "created for other deals" again suggests prior successful funding efforts by Waterfall. The bond documents attached included certificates of ownership purporting to show that Waterfall owned a bond worth $ 9 million, and that its lender owned a bond worth $ 1.5 million. It is uncontroverted that no one ever told Watchous there were any restrictions associated with these bonds.

The same night, Mournes forwarded this email to Elfsten with a message that said "FYI … Call me." Elfsten responded with an email that said "Bill, you need to talk to me now."

**The Letter of Intent is signed, July 28**

At a conference call the following morning, Mournes and Zouvas represented to Watchous that Waterfall had the ability to enter into a joint venture.[1]

---

[1] The Waterfall defendants attempt to refute this fact by citing the brief affidavit supplied by Gordon Duval, which ends with the blanket statement that "Waterfall never represented to Watchous that it had closed a

Watchous' counsel sent Mournes, Duval, Bench, and Zouvas a draft letter of intent for review and comment. The draft letter of intent did not call for a $175,000 deposit.

Mournes forwarded the email to Elfsten and Hasegawa stating: "FYI … spoke to Klee. Door is reopened…. Here is their revised proposal. Call shortly."

Elfsten responded: "You would look like a hero to everyone if you increased it to $82,500,000 to include our 3%. It might cement the deal and would sure make us and Klee feel good."

Elfsten sent another email a few hours later stating that he assumed the $175,000 would be addressed in a separate agreement because it was not addressed in the draft of the letter of intent sent by Watchous.

Duval initially approved Watchous' draft letter of intent. Klee then again asked Waterfall to provide references of those "with whom you have done similar joint ventures."

The parties continued to negotiate the terms of the Letter of Intent on July 28, 2016, including increasing the amount of funding to Watchous as suggested by Elfsten and requiring Watchous to make the $175,000 refundable deposit.

---

funding project" sponsored by Pacific in the past. (Gordon Aff. ¶ 20). The affidavit makes no reference to the July 28, 2016 conference, and provides no basis for concluding that Duvall has personal knowledge about what was said at the meeting. Moreover, the affidavit does not refute the cited fact: that during the call Waterfall officers said that it had the ability to enter this joint venture.

Klee signed the Letter of Intent on behalf of Watchous and returned it to Waterfall and Pacific. Klee stated that he would wire the $175,000 the following day, but had not yet received the requested references.

Mournes forwarded this email to Elfsten and Hasegawa and thanked them for their help.

Elfsten responded, "we are glad it worked."

Mournes returned the fully executed Letter of Intent to Watchous that evening.

The Letter of Intent required Watchous to make a $175,000 deposit, which was to be returned when the parties closed their joint venture or when the letter of intent was terminated. The letter could be terminated after August 17, 2016.

On July 28, 2016, Duval sent Watchous alleged references for Mournes, Duval, and Zouvas. The references were Joel Gersten, Patrick Sizemore, Bart Carlson, Shandon Gubler, Vern Wilson and Vincent Ramirez. The purported references all have a direct relationship with Waterfall, and had a vested interest in Waterfall obtaining funds from Watchous to attempt to close Waterfall's intended bond transaction. Gersten, Carlson, Gubler, and Wilson were all owed significant sums from Waterfall. Sizemore, Carlson, and Gersten were included on internal Waterfall emails on July 29, 2016. Ramirez was an agent of Waterfall's and member of its executive committee. There is no evidence that

Waterfall ever completed a successful venture, let alone oil and gas joint venture, with any of the references.[2]

The Pacific defendants point to a July 29 email by Bob Bench as showing that Watchous knew that Waterfall did not have funds on the hand for the joint venture, and that it needed to close on the Venezuelan bonds. But while the email references the closing, it does not state that funding the joint venture was contingent upon it. Further, the email must be read in conjunction with Pacific's representation that Waterfall had closed on other bonds, and had brought in some $10 billion in funding.

Watchous deposited $175,000 on July 29, 2016. Before sending it, Klee had a telephone call with Elfsten in which Elfsten vouched for Waterfall and its ability to repay the deposit if it was made.

Watchous entered into the Letter of Intent and paid Waterfall in reliance on Hasegawa's representations that Waterfall brought in $10 billion annually, that it had the ability to enter into the joint venture, that it owned bonds worth hundreds of millions of dollars, and that Pacific had done other successful transactions with Waterfall in the past. None of the defendants told Watchous that Waterfall did not own the Venezuelan bonds without restriction (as opposed to some claim to a "beneficial" interest in them), that

---

[2] The Waterfall defendants attempt to controvert this finding of fact, but the cited evidence at most establishes a fact question as to whether Waterfall owed money to one of the references, Vern Wilson. Gordon Duval avers that he did not intend his list of references as an indication of successful funding ventures by Waterfall. But this ignores the content and context of the emails. The list was supplied in response to Klee Watchous's specific request for prior joint ventures by Waterfall. Duval added no caveats to the list when he sent it to Watchous. In context, the references list would inevitably be misconstrued by the plaintiff.

Waterfall did not have liquid assets available to fund the joint venture, that Waterfall had defaulted on millions of dollars in promissory notes, that Waterfall had never succeeded in funding any project Pacific brought to it, or that Waterfall had never met any of the countless promises concerning the timing of its bond closing. All of these facts would have been material to Watchous, and had Watchous been made aware of any of these facts it would not have entered into the Letter of Intent or wired Waterfall $175,000.

On July 29, Duval emailed Mournes and stated:

I am very pleased to report that this morning we received the funds necessary to send the $160,000 to Dr. Tinoco so the SWIFT can go out. I forwarded the $160,000 immediately to Dr. Tinoco. The funds came from Palomino Petroleum [an entity owned by Watchous]…. This is the group that flew in with their CEO, CFO, chief engineer, attorney, and other officers from the Midwest on their private plane (pictures attached) to meet with Bill earlier this week. This is a very sophisticated oil company that reviewed our business plan, our projects, and checked many of our references. They were very thorough and knew exactly what to look for. They have been in business for decades and are already producing millions of dollars of oil per year. They were impressed and acted very quickly. Mark Zouvas and Bob Bench did a good job answering their technical questions. But this funding only occurred because of Bill Mournes' amazing capacity to just keep working tirelessly until he finds a solution. His relentless effort to keep plugging away until a solution appears is what made this funding possible. I often complain to Bill that we need to focus on one thing at a time and cast aside the 10,000 other distractions. But in this case, we succeeded because of Billy's ability to juggle many balls at the same time.

I want to thank you for your support after our "call to action." Many people stepped forward to contribute what they could. That is very gratifying to have loyal friends that are still standing by us through this difficult process. The sad thing is that most of our crew are pretty tapped out because this has been such a long and difficult process that none of us could have anticipated. That is why this money coming in from the oil company was

literally a miracle, and we should never forget the source of such miracles. Say a prayer of thanks.

We are now asking Jose and Dr. Tinoco to push the BCV to do its part. As soon as possible Dr. Tinoco will be meeting with the BCV to get the 199 sent.

We will still need funds for travel and other operational costs but hopefully we can pass the hat for those needed funds.

Thanks for your help.

Mournes responded, "THANK YOU GENTLEMEN … GAME ON .. SEMPER FIDELIS … SEMPER PARATTIUS …. "

Mournes blind copied Elfsten with his response to Duval's "literally a miracle" email. Elfsten in turn responded to Mournes (copies to Hasegawa and Zouvas):

Bill, we thought it was going directly to the bank which is what we told Klee. This is a funny email giving Bob the credit and not even mentioning us. O well

On August 8, 2016, Elfsten emailed Mournes to ask when Watchous would get its $175,000 back so that they could engage Beal Bank. Mournes responded that he was working on it. Elfsten replied he thought the monies were coming from $600,000 that Waterfall had in Curacao, and asked if that was gone and that Watchous needed the monies returned to engage Beal Bank. Mournes responded "Yes … Multiple Sources …"

Elfsten:

Klee called me, we've been talking for about half an hour. He was a little on the panicked side because Mark Zouvas told him you are probably not getting money until sometime in September and we have been telling him you're getting it next week or at worse, the week after that.

Again it would be really nice if we were in these calls since they are our customers and it seems like we're always the ones that keep having to put them back together and it would also be nice if everyone told them the same story….

We didn't get a clear answer from you, is the Curacao money still available to pay these guys back, which is what we told them?

Mournes then explained that Zouvas told Watchous that Waterfall could easily bridge loan him into a master funding agreement since Watchous was on a short fuse. Elfsten replied asking Mournes to call him because he and Hasegawa "OBVIOUSLY DON'T KNOW WHAT IS BEING TOLD TO THESE PEOPLE."

On August 10, Mournes text messaged Klee Watchous and told him that he was finalizing travel plans for Waterfall's bond closing in the next 24 hours.

A week later, Mournes text messaged Klee stating, "Made ALL closing arrangements with Venezuela today."

On August 23, 2016, Watchous emailed Pacific to inform it that Watchous wished to engage Beal Bank because it could not:

continue to rely on timeframes which get pushed back seemingly each day. I've texted and called Bill on numerous occasions with promises of updates and positive indications but have no concrete evidence that this deal will close. Accordingly, we must move forward with Beal/CSG to protect ourselves in the event the JV deal doesn't close as scheduled.

Elfsten forwarded this to Mournes explaining that Watchous was in a "panic because none of the timings that have been told to him by you and us have happened including the $175,000 that he was going to get back originally 2 weeks ago then last week."

Hasegawa emailed Watchous later that day, stating that Pacific understood Watchous going forward with Beal, "but don't count Bill out even though he is extremely unorthodox which we said going into it. Let's work both of them at the same time if that's okay with you."

On August 24, 2016, Klee emailed Pacific for an update on the status of the joint venture with Waterfall. Elfsten responded that he had just got off the phone with Mournes and Zouvas and they were having a hard time getting to the same value, and indicated that he understood the $175,000 would be returned the following week.

Watchous' responded:

Thank you for the update. We need to know exactly where the disconnect is on their values versus our price so that we are able to address their specific concerns. It would have been nice to know this before we wasted one month and go so far into the deal. When we met Bill in New Jersey, he said repeatedly, "you pick the number my friend . . . at these costs we make money, you do the math. . . it works. . ."

At this point, our primary focus needs to be getting our $175,000 back as soon as possible. We are now in the fourth week of being promised that it would be returned "sometime later this week." In essence, we helped finance Bill's efforts when he and Mark Zouvas had either not reviewed anything about our deal or they didn't ever have any intention of paying anywhere close to that amount (possibly both).

We acted in good faith. I'm not sure about the other side.

The bottom line is that our $175,000 must be returned immediately. We can ill afford to have it as an outstanding Account receivable at a time when we desperately need it to keep our businesses afloat.

Elfsten forwarded Watchous' email to Mournes and asked him how Mournes wanted him to respond.

On August 25, 2016, Hasegawa told Watchous that the disconnect on the value was not with Mournes, but with one of his underwriters who did not believe the proven reserves justified an $ 80 million joint venture. In a later email, Hasegawa relayed his understanding that the $175,000 would be returned very soon.

On August 27, 206, Elfsten emailed Mournes and asked him to call him so that he could update him on a meeting Watchous had with Beal Bank.

On August 29, 2016, Mournes text messaged Klee and told him he would get his $175,000 back that week and that he had just paid "BCV $500k to renew both bonds …"

The same day, Zouvas emailed Watchous to arrange a conference call to discuss the materials with "our chief petroleum scientist," Vince Ramirez.

On September 6, 2016, Watchous emailed Pacific and asked for yet another update. Elfsten forwarded this email to Mournes and asked him how to respond.

Watchous formally terminated the Letter of Intent on September 8, 2016. On September 14, 2016, Watchous emailed Pacific again because it had not received its $175,000 as promised. Later that day, Elfsten told Watchous that it should have its $175,000 back on Friday, September 16, 2016.

On Monday, September 19, 2016, Hasegawa emailed Watchous and told him that Mournes said the $175,000 would be sent back that week.

On Friday, September 23, 2016, Watchous emailed Pacific for an update. Later that day, Hasegawa responded "you will have your money Monday and there is a joint

venture proposal being done by Gordon and you should have that Tuesday or Wednesday."

On Tuesday September 27, 2016, Watchous emailed Pacific for an update. Hasegawa forward the email to Mournes stating "what is being done about Klee? He sent another e-mail below. Can someone please talk to him as we can only stall so much?"

In the follow up email exchange between Mournes and Pacific, Hasegawa stated: "we've been dragging these guys out for 8 weeks and Chuck is embarrassed to talk to or text them on his phone as he was the one that got them to stand up and do this." Afterwards, defendants continued to provide excuses as to why Waterfall had not been able to close the bond transaction.

On October 17, 2016, Elfsten emailed Mournes, Zouvas, and Hasegawa:

The KRG guys just called the office and talked to Mark. I believe they wanted me to verify whatever transaction you and Mark Zouvas and [sic] are doing with them.

Mark Hasegawa told them I was out to lunch. What do you want me to say?

This is probably not dissimilar from the conversation where *Klee wanted me to vouch for yo*u before sending the $175,000 which hopefully he'll get back soon. Please call me as I'm assuming they haven't wired the $10,000 yet.

(Emphasis added.)

Watchous never received its $175,000 back. [Ex. A ¶ 38].

On February 21, 2018, after the filing of the present action, Hasegawa emailed Mournes, Duval, and Elfsten, "We've done nothing but defend and advocate for

Waterfall for 5 years when many people would have lost faith long ago. We even renewed, fixed and hosted the broken Waterfall website at our expense."

## Catch Resources

Dale Galbraith was the President and CEO of Catch Resources, a Canadian corporation. In 2016, Catch Resources was seeking a joint venture partner to provide some $ 5 million to buy Regent Resources Ltd., and came into contact with Pacific. During conversations about the likelihood of obtaining funding, Pacific asked Catch to give an overview of the assets it wanted to acquire. Catch Resources provided a presentation to Pacific.

On June 10, 2016, Catch participated in several conference calls with Hasegawa and Elfsten to discuss the project and Pacific's ability to find funding for it. According to Galbraith, Hasegawa and Elfsten represented that Pacific had a group it had worked with in the past that would be interested and had the ability to provide the funding, contingent on satisfactory answers relating to the project's geology, which it supplied.

Hasegawa and Elfsten denying telling Galbraith that Waterfall had cash on hand to immediately fund projects.

Catch and Pacific entered into three Non-Exclusive Placement Agreements. Catch paid Pacific $7,600 and Pacific agreed to try to find joint venture partners. Catch wire transferred the $7,600 to Pacific, and Pacific introduced Waterfall as the group who would fund the project.

Waterfall indicated that they had a group "overseas" that was ready and able to fund all projects vetted by Waterfall. Zouvas was involved in Waterfall's interactions with Catch.

Pacific represented that it had engaged in transactions with Mournes and Waterfall and that Waterfall would be closing an international transaction in the near future and would have the ability to enter into a transaction with Catch Resources.

At Catch's request, Pacific provided two letters of support on June 24, 2016. These letters indicated Pacific was working closely with Catch to support its effort to secure funding for its oil and gas acquisition, and were addressed to ATB Corporate Financial Services, the lead lender in the acquisition and Regent Resources, the seller of the assets.

On July 1, 2016 Catch Resources received an email from Hasegawa asking Catch to "refashion" its "Sources and Uses" document to represent a larger joint venture. Catch Resources took this to mean that Pacific had the ability to fund larger projects and that they wished for Catch Resources to present larger projects for funding.

On July 15, 2016, Pacific and Waterfall represented that the funding had not come through yet but would in the immediate future. At that time, Pacific and Waterfall asked Catch if it had any additional projects it would like to include in the funding pipeline.

On July 25, 2016, at the request of Pacific, Catch provided a letter addressed to Mournes. The letter was intended to provide confidence to Waterfall that Catch Resources had a solid runway of acquisitions that Waterfall could fund.

On August 10, 2016, Catch provided Pacific a document which outlined the proposed acquisition of Felcom Resources Corp. This acquisition was considered a "bolt on" acquisition to the Regent acquisition, and was confirmed to satisfy Pacific's and Waterfall's need for larger acquisition deals. Pacific asked that Catch Resources enter into a second Non-Exclusive Engagement Placement Agreement, which provided for a second $7,600 payment to Pacific. Five days later, in reliance on Pacific's representation that Waterfall would fund the Felcom Resources Corp acquisition, Catch Resources entered into in a second Non-Exclusive Placement Agreement with Pacific and paid it an additional $7,600.

Pacific sent a third Non-Exclusive Placement Agreement, dated October 7, 2016, and asked for an additional $7,600 payment. However, Catch had become concerned about Pacific and Waterfall's ability to perform and it did not provide the requested $7,600 to Pacific. It told Pacific that it wanted to wait until the funding arrived for the two previous projects before moving forward with payment on the final agreement.

In response to Catch's concerns, Pacific and Waterfall cited the Patriot Act and issues relating to the bonds as the reason that they could not provide details regarding Waterfall's source of funding. Catch's concerns continued to grow and it sought reassurance from Pacific and Waterfall.

During the months from August through November, Pacific and Waterfall continued to maintain that funding from their overseas counterpart was imminent. Waterfall and Pacific maintained the delays were primarily connected to the completion

of a multimillion-dollar Bond Certificate and completion of documents pertaining to the Patriot Act, which Waterfall assured was in place to govern the transfer of funds from foreign entities into the United States. Catch continued to ask for evidence that these documents in fact existed or for details of the current state of the documents, but each time Catch was told verbally that Waterfall could not provide that type of information.

Pacific represented during a phone call that Mournes or other Waterfall partners were then on their way to Saudi Arabia to sign the paperwork necessary to complete the Bond Certificates and Patriot Act documents. It told Catch that with the conclusion of these documents, Waterfall would then be allowed to move the funding to the United States.

Waterfall never provided any funding for Catch's projects.

## KRG's project (August 2016-May 2017)

Ric Harris is a Canadian citizen and resident of Canada. His background is in corporate structure, financing, and operations. He has a history in raising funding for ventures through private placement. Harris was the Chairman of KRG Global Energy, which in 2016 was seeking hundreds of millions of dollars for potential projects.

KRG came into contact with Pacific, and executed a Non-Exclusive Placement and Fee Agreement on August 1, 2016, under which Pacific would act as KRG's agent using its best efforts to find funding for one of KRG's projects. KRG paid Pacific the $7,600 processing fee required by the Agreement.

Before entering into the agreement, Harris reviewed Pacific's website and participated in multiple interstate telephone calls with Hasegawa and Elfsten. Hasegawa and Elfsten represented that they had multiple funding sources with whom they had previously done deals. KRG entered into the agreement and paid Waterfall the $7,600 in reliance on these representations.

Waterfall was always the funding source Pacific intended to use, and Pacific never discussed an alternative funding source. Hasegawa and Elfsten represented to Harris that they had engaged in prior transactions with Waterfall, and were working on several other transactions with Waterfall. According to Harris, Hasegawa represented Waterfall was a very successful funding source that had access to hundreds of millions of dollars with an asset base of a variety of bonds.

Elfsten and Hasegawa again state that they never promised any client that Waterfall currently had funds to invest, or that Pacific's prior deals with Waterfall were successful. But in context, to mention all these prior transactions – without mentioning the consistent track record of failure — is misleading. It represents they were successful.

It is uncontroverted that Elfsten and Hasegawa did *not* tell Harris that Waterfall was in default on promissory notes. They did not tell KRG that Waterfall had not closed any transaction involving Pacific, that Waterfall did not actually own the bonds it intended to use to obtain monies to provide funding for projects. All of this information would have been material to KRG, and KRG would not have moved forward with Pacific or Waterfall had it known any of it.

On August 25, 2016, KRG participated in a call with Elfsten, Hasegawa, Mournes, and Zouvas. Elfsten and Hasegawa never told KRG when Waterfall failed to return Watchous' deposit as agreed. Had they, KRG would not have continued forward with Waterfall.

The Pacific defendants respond to this fact by asserting that Waterfall had told it that it was then "in the process of making arrangements" to return the $175,000 deposit. However, this fails to refute the thrust of the fact presented by Watchous:  that KRG would not have continued to deal with Waterfall had it known Waterfall was avoiding its legal obligation to return the Watchous deposit.

On August 30, 2016, Hasegawa emailed KRG (copying Elfsten) to schedule a conference call with Mournes and Zouvas. The email stated that the call was subject to Mournes' availability, because he was "in the process of doing his closings."

On September 1, 2016, Harris emailed Hasegawa and Elfsten additional information concerning a phase of one of its projects, purchasing the Pelican refinery for $20 million, and asked that they set up a call with Mournes. Hasegawa responded:

> We just had two meetings with Bill and there isn't really a need for an immediate third as Bill said he was in agreement to do the $20 million and the $1 million could be put up somewhere around the middle of the month. We're copying Bill so he can see what you're saying which is great and we all agree per the last meeting that this would be a great start.

The $1 million was the deposit necessary to secure the purchase of the Pelican refinery, and no defendant told KRG of any contingencies to it being provided.

On September 9, 2016, Pacific and KRG entered into another Non-Exclusive Placement and Consulting Fee Agreement to cover KRG's additional projects and a Mutual Non-Circumvention and Non-Disclosure Agreement relating to the projects.

Based on the representations by Mournes, Elfsten, and Hasegawa as to Waterfall's ability to provide funding, KRG used its business relationships to engage organizations under an exclusive relationship and made commitments to those organizations. KRG also stopped seeking other funding sources.

On September 27, 2016, Harris emailed Elfsten and Hasegawa about making an offer to purchase another Channel Refinery, and that in order to tie up the project they needed a letter of intent to purchase it for $ 50 million and proof of funds. Hasegawa responded that he did not see a problem with a letter of intent or proof of funds from the fund.

Hasegawa avers that he told Harris there would be no problem because of assurances by Mournes. But it remains uncontroverted that Hasegawa did not candidly inform KRG about the actual track record of Waterfall, or the actual status of the Venezuelan bonds.

October 4, 2016, Harris emailed Mournes, Elfsten, and Hasegawa to set up a conference call to discuss KRG's projects. He wrote that the seller of the Pelican refinery was:

> Still waiting for POF and LOI we promised him two weeks ago. Please our word, reputation and credibility is very important to us so when we make a commitment we need to constantly manage those expectations. If there is

a delay no problem but we need to be proactive and convey that before the other party feels unsure.

Hasegawa represented that Waterfall and Mournes have "not been able to do the proof of funds letter for securities reasons as they are still in the process of closing."

On October 13, 2016, Waterfall's Zouvas emailed Harris concerning the letter of intent and proof of funds for the purchase of the Pelican refinery. He asked Harris if he already had something drafted, and if so to send it to him so that he could work it up on Waterfall's letterhead. Later that day, Zouvas emailed KRG a letter of intent for a joint venture. This provided:

> We have attached WMI's proof of funds, which is in the form of a EuroClear report stating Waterfall's beneficial ownership of certain global bonds. These bonds are being collateralized by WMI for a debt financing transaction whose proceeds will be used for investment purposes; we expect to be able to deploy capital within the next 30 days.

The letter stated that Waterfall and KRG understood and agreed that the terms of joint ventures for the projects would be negotiated after the completion of due diligence. Included was a EuroClear printout that contained, in part, an Affidavit and separate Certificate of Ownership purporting to evidence that Waterfall owned Venezuelan bonds with a face value of $900,000,000. A similar letter of intent relating just to the Pelican refinery was also provided.

No one told KRG that Waterfall did not own the bonds (as opposed to having some unexplained "beneficial" interest in them). Had KRG known this, it would not have proceeded with Waterfall.

Mournes asked KRG to pay Waterfall $25,000 for obtaining funding. KRG refused. Mournes then offered to make the $25,000 refundable and KRG still refused. Mournes then began to lower the amount he was requesting.

On October 16, 2017, Mournes emailed Harris (with a copy to Zouvas, Elfsten, and Hasegawa) wire coordinates and asked that he send $10,000 for a refundable deposit/due diligence fee. The wire coordinates included were for Magnolia Hill Resources, LLC, an entity associated with Zouvas.

The next day, Harris emailed Mournes and Zouvas and asked for a letter on Waterfall's letterhead stating that the deposit would be refundable on or before November 3, 2016. In response, Harris received a letter dated October 17, 2016, signed by Mournes as the Managing Director of Waterfall, stating that Waterfall required a nominal fee to initiate due diligence. It further provides, "because of the situation we discussed, and your introduction to us by Pacific National, we agree to refund this fee by November 3, 2016."

The same day, Elfsten emailed Mournes, Zouvas, and Hasegawa:

The KRG guys just called the office and talked to Mark [Hasegawa]. I believe they wanted me to verify whatever transaction you and Mark Zouvas and are doing with them.

Mark Hasegawa told them I was out to lunch. What do you want me to say?

This is probably not dissimilar from the conversation where Klee wanted me to vouch for you before sending the $175,000 which hopefully he'll get back soon. Please call me as I'm assuming they haven't wired the $10,000 yet.

Neither Elfsten nor Hasegawa told KRG that Watchous made a refundable deposit with Waterfall a few months earlier and that Waterfall had not refunded it as agreed. Had KRG known that, it would not have paid Waterfall a fee.

On October 19, 2016, Harris requested a copy of page 21 of the EuroClear screen shot. Shortly thereafter Elfsten sent Harris an email stating:

> Shame on you for not copying me on e-mails to Bill Mournes. You are violating any sense of respectability that I had for you. What you're asking for is highly confidential with all the security codes on it which no one in their right mind would give you as you are not privileged to receive it. It's almost like you're trying to play one side against the other, which with the funds does not work. With regard to your offer to give Bill $5,000 forget it. You're doing a billion dollar transaction and you can't come up with $10,000; I don't have much I can say about that other than the fund is wondering why they are working on this.

There was no reason why the bond information could not be shared. Waterfall had already provided bond information as proof of funds to allow KRG to show others it would have funding.

Also on October 19, 2016, Mournes sent an email stating:

> Per our agreement please accept this writing as my official confirmation and acknowledgement that that (sic) the deposit/due diligence fee in the amount of $10,000 USD will be returned to you upon your request on or before November 3, 2016. . .

Later that day, Waterfall agreed to accept $5,000 as a refundable deposit. The funds were sent by wire transfer to Magnolia Hill Resources, on October 20, 2016.

Waterfall failed to return the $5,000 deposit as agreed on November 3, 2016. In response to plaintiff's summary judgment motion, the Waterfall defendants argue that

Zouvas earned the $5,000 for underwriting services. But even if such services were provided and were worth $5,000, the services were provided to Waterfall, not KRG. The agreement between Waterfall and KRG explicitly provides that the $5,000 deposit made by KRG was refundable by Waterfall. Consistent with prior practice, Waterfall failed to follow through on its commitment.

On November 8, 2016, Zouvas emailed KRG concerning the status of funding and the anticipated joint venture on behalf of Waterfall, stating Waterfall hoped to have "confirmation from the guarantor and lending banks today, which is the first step in closing the transaction."

On or about November 16, 2016, KRG had conference call with Mournes and attempted to get additional information from Mournes concerning status of his funding. Waterfall then went dark for a period.

On January 4, 2017, Harris emailed Elfsten and Hasegawa with regard to his concern about the lack of communication from Pacific and Waterfall and the negative impact it had to KRG's relationships and reputation. Harris asked Hasegawa what KRG needed to do to seek financing from other sources Pacific represented it had. Hasegawa responded that Waterfall was the only source that would be willing to fund KRG's projects and that he was told Mournes "is very close to closing so that's a good thing."

After January 4, 2017, defendants continued to make representations to Harris and KRG that Waterfall would be closing its transaction soon and funds would be available, including a representation from Hasegawa on March 27, 2017, that Waterfall was in the

"middle of closing its bonds" and a representation from Hasegawa on April 6, 2017, that Waterfall was in the process of closing its bonds and was "in what we're calling the quiet period."

Waterfall ended the relationship with KRG on May 27, 2017. Waterfall never provided any funding for KRG's projects, and KRG lost business relationships due to actions it took in reliance on defendants' promises to provide funding for its projects.

KRG requested that Pacific return the $7,600 KRG paid it and the $5,000 paid to Waterfall. Neither was returned.

## Waterfall's history of default

The evidence established that before and after the Watchous Letter of Intent, Mournes and/or one of the Waterfall Mountain entities issued a number of promissory notes, as summarized in the following table. These notes also provided for Mournes to pay a loan fee, stated the entire unpaid balance would accrue interest at a rate of 18% per annum until paid, and matured on the earlier of either the stated day or when Waterfall Mountain closed its first "pending" transaction relating to the Venezuelan bonds. In many instances, the notes were ostensibly secured by the Venezuelan bonds. Many required Mournes to make a substantial loan fee (10 to 30% of the principal), and provided for high interest rates (5% per month, or 18% per annum) or a double (or more) repayment of principaI after a given date. In almost every instance, the Waterfall entities have failed to make the payments due.

| Date of Note | Holder | Principal | Maturity/Payment Date |
| --- | --- | --- | --- |
| April 24, 2013 | Agricon Global | 50,000 | September 15, 2013 |
| August 5, 2013 | Agricon Global | 3,000 | February 2, 2014 |
| September 19, 2013 | Nancy T. Siezemore | 75,000 | November 20, 2013 |
| December 2, 2013 | Taylor Bench | 5,000 | December 31, 2013 |
| December 23, 2013 | AF Consulting | 50,000 | May 23, 2014 |
| June 18, 2014 | James J. Pierce Scarlett | 200,000 | |
| September 15, 2014 | Jared N. Huish et al. | 260,000 | November 1, 2014 |
| September 26, 2014 | Nick Luekenga | 140,000 | December 29, 2014 |
| January 26, 2015 | Little Hollow Farms | 250,000 | February 28, 2015 |
| March 31, 2015 | Little Hollow Farms | 70,000 | April 30, 2014 |
| May 2, 2015 | Shenjet Investments | 20,000 | August 2, 2015 |
| May 6, 2015 | Shenjet Investments | 55,000 | August 6, 2015 |
| May 13, 2015 | Highstreet Advisers | 50,000 | July 13, 2015 |
| June 22, 2015 | James J. Pierce Scarlett | 50,000 | September 18, 2015 |
| July 31, 2015 | Neil Dutson | 19,000 | March 31, 2016 |
| August 7, 2015 | Scott Huish | 59,500 | November 30, 2015 |
| August 26, 2015 | Richard Cutshall | 250,000 | November 26, 2015 |
| September 1, 2015 | Neil Dutson | 71,500 | December 31, 2015 |
| September 29, 2015 | Bart Carlson | 32,500 | December 31, 2015 |
| September 30, 2015 | Bart Carlson | 38,600 | December 31, 2015 |
| October 1, 2015 | David Andrews | 280,000 | November 30, 2015 |
| October 9, 2015 | Royalton IRA, LLC | 70,000 | November 30, 2015 |
| October 9, 2015 | The N. Dan Reeve Trust | 100,000 | November 30, 2015 |
| October 14, 2015 | David Andrews | 100,000 | November 30, 2015 |
| October 14, 2015 | Kostas Katsohirakis | 50,000 | November 30, 2015 |
| October 19, 2015 | Scott Kimche | 130,000 | November 30, 2015 |
| October 20, 2015 | Scott Huish | 10,000 | November 30, 2015 |
| October 26, 2015 | GHSH | 236,197 | November 26, 2015 |
| October 31, 2015 | Bart Carlson | 15,000 | December 31, 2015 |
| November 13, 2015 | HighStreet Advisors | 51,000 | December 31, 2015 |
| December 15, 2015 | Joel Gersten | 60,000 | February 15, 2016 |
| December 17, 2015 | Joel Gersten | 50,000 | February 15, 2016 |
| December 31, 2015 | James J. Pierce Scarlett | 105,000 | March 31, 2016 |
| January 26, 2016 | Joel Gersten | 14,000 | February 26, 2016 |
| February 23, 2016 | Steven A. Bates | 120,000 | April 1, 2016 |
| March 10, 2016 | Miesen Devel. Corp. | 500,000 | May 9, 2016 |
| March 30, 2016 | Kim Harris | 100,000 | April 30, 2016 |
| March 30, 2016 | Steven A. Bates | 260,000 | April 30, 2016 |
| April 18, 2016 | BST Ventures 64 | 180,000 | May 18, 2016 |
| April 21, 2016 | Joel Gersten | 100,000 | May 27, 2016 |
| August 8, 2016 | James J. Pierce Scarlett | 40,000 | October 8, 2016 |
| August 8, 2016 | Neil Dutson | 10,000 | August 8, 2017 |
| August 17, 2016 | Huish Holdings | repay 3/1/16 note | September 6, 2016 |
| August 17, 2016 | Steven A. Bates | repay 3/30/16 note | September 6, 2016 |
| August 24, 2016 | Huish Holdings LLC | 50,000 | February 24, 2017 |
| August 24, 2016 | Kim Harris | 50,000 | September 25, 2016 |
| August 29, 2016 | Huish Holdings LLC | 20,000 | October 31, 2016 |
| August 29, 2016 | Bart Carlson | 2,500 | August 29, 2017 |
| August 31, 2016 | Eric Maynes | 3,000 | August 31, 2017 |
| September 23, 2016 | Joel Gersten | 9,895 | August 31, 2017 |
| November 4, 2016 | Forbes Global Services | 40,000 | December 4, 2016 |
| November 14, 2016 | York Capital Founders | 20,000 | December 14, 2016 |
| November 30, 2016 | York Capital Management | 50,000 | December 14, 2016 |

| | | | |
|---|---|---|---|
| December 14, 2016 | Forbes Global Services | 250,000 | January 15, 2017 |
| February 5, 2017 | Vector Capital | 150,000 | February 15, 2018 |
| February 8, 2017 | Vector Capital | 50,000 | April 2, 2018 |
| May 19, 2017 | Simmons Benefit Group | 50,000 | July 19, 2017 |
| June 16, 2017 | Forbes Global Services | 50,000 | July 31, 2017 |
| June 20, 2017 | Kimberlee Gubler | 150,000 | June 30, 2017 |
| July 3, 2017 | The Stonington Group | 100,000 | July 31, 2017 |
| October 6, 2017 | Steven A. Bates | 5,000 | October 13, 2017 |
| October 6, 2017 | Ed Ekstrom | 5,000 | October 13, 2017 |
| October 6, 2017 | Simmons Benefit Group | 7,000 | October 13, 2017 |
| December 31, 2017 | James J. Pierce Scarlett | 19,180 | January 31, 2018 |
| January 27, 2018 | Robert K. Bench | 100,000 | March 28, 2018 |
| March 2, 2018 | Robert K. Bench | 100,000 | April 2, 2018 |
| March 14, 2018 | Vector Capital | 70,000 | April 14, 2018 |
| April 24, 2018 | Menco, Inc. | 25,000 | May 24, 2018 |

## Conclusions of Law

Watchous argues in its motion that the evidence supports an award in its favor on its claim of fraud by silence against Elfsten and Hasegawa. it also argues that the evidence supports finding of civil fraud by all of the individual defendants, violation of 18 U.S.C. § 1962(c) (RICO), finding breach of fiduciary duty, and denying the affirmative defenses (waiver, unclean hands, estoppel, and failure to mitigate) raised by the defendants.

The Pacific defendants seek summary judgment on Watchous's fraud claims, arguing that there is no evidence of deceit or misrepresentation. They argue that they did not know Waterfall could not actually fund the joint venture, could not know of Waterfall's future intent, and did not actually benefit from the alleged fraud. They argue that events occurring after payment of the deposit are irrelevant, that plaintiff has failed to establish liability under RICO, and that the court should grant summary judgment on their cross-claim for indemnification against Waterfall.

The Waterfall defendants argue that Watchous lacks proof of fraud by Mournes, Duval and Zouvas because there is no evidence they believed funding from the closing of the bonds was imminent, and that any statemetns they made were not material. They also argue that Watchous's RICO claim should be dismissed.

## Fraud and Breach of Duty

The court finds that the uncontroverted facts warrant a finding of fraud and breach of fiduciary duty.

With respect to fraud, Pacific's motion both ignores plaintiff's claim of fraud-by-silence, and seeks to recast its actual fraud claim into the assertion that Elfsten and Hasegawa failed to anticipate how, in the future, Waterfall would fail to provide funding for Watchous. But the plaintiff's actual fraud claim does not depend upon some guaranty of future performance. The plaintiff alleges that the individual defendants in June and July of 2016 actively misrepresented the historic and contemporary facts about Waterfall's dubious finances, loan defaults, and consistent lack of success in funding similar projects. Had Watchous known the true state of affairs, the evidence establishes, it would not have lost the $175,000 deposit given to Waterfall.

The court finds that the evidence in support of plaintiff's fraud claims is sufficiently strong that summary judgment is indeed warranted in its favor. This necessarily warrants the denial of the summary judgment motions filed by defendants on that issue.

Elfsten and Hasegawa knew that Pacific had brought dozens of prospective joint ventures to Waterfall since 2013, without a single success. The results were always the same, with the client receiving nothing but delays and promises that Waterfall would soon be closing on its bonds. Funding was just around the corner. But none of this was revealed to Watchous.

Further, the evidence shows that Pacific made actual misrepresentations to Watchous which painted Waterfall in a positive, but false light. Pacific told Watchous that it would "be perfect" for Watefall, "the fund we represent." Pacific had done transactions in the past. To prospective clients like Watchous, such references to past transactions could only be taken to mean past *successful* transactions. Although Pacific mentioned other prospective financing by way of loans, it presented only Waterfall as a potential candidate for a joint venture of the size that Watchous wanted. Pacific indicated that Waterfall "bring[s] in about $10 billion a year" in financing. While Waterfall "typically only do[es] joint ventures or equity," it could give Watchous a short-term multi-million dollar loan. Waterfall, which Hasegawa described as "our fund," was closing on two more bonds this month worth $2.4 billion. Elfsten assured Watchous that Waterfall could refund the deposit if the funding was not approved.

At the same time, the defendants knew Waterfall's finances were limited. Before Watchous made the deposit, Pacific wrote to Waterfall that it "wish[ed] we had the money to help you. As you know, we're a little on the tight side." From Waterfall's perspective, the $175,000 deposit was a "miracle."

The Pacific defendants failed to present anything like a true picture of Waterfall. Relying on this false picture, the plaintiff made the $175,000 payment to Waterfall. But for this false picture, Watchous would not have lost this money.

As noted earlier, the defendants have pointed to an email by Bob Bench on July 29, 2016 as indicating that Waterfall needed to close on its bonds before it could support the joint venture. But this does not show that Watchous's action in making the deposit was not reasonable reliance, given the other strong representations that Waterfall had closed on other bonds in the past, and that it had successfully funded other transactions, generating billions in income.

The Pacific defendants also argue there can be no actionable fraud here because they did not personally benefit from the alleged fraud. The court rejects the argument for two reasons. First, Kansas has required personal profit in cases involving fraudulent misrepresentation of a future event. *See Paradigm Alliance, Inc. v. Celeritas Tech.*, 659 F.Supp.2d 1167, 1180 (2009); *Gerhart v. Harris*, 261 Kan. 1007, 1014 , 934 P.2d 976 (1997) ("A promise to do something in the future, if the promisor had no intention at the time the promise was made to carry it out, is deceit, and if the promisor obtained anything of value by reason thereof, there is actionable fraud". Here, as noted earlier, the plaintiff's claim is directed at the false picture of the present state of Waterfall in July, 2016. Second, there was a benefit – the course of dealing cited by plaintiff brought in the nonrefundable $7,600 paid to Pacific.

Fraud by silence arises where:

> (1) The defendant had knowledge of material facts that the plaintiff did not have and could not have discovered by the exercise of reasonable diligence; (2) the defendant was under an obligation to communicate the material facts to the plaintiff; (3) the defendant intentionally failed to communicate to the plaintiff the material facts; (4) the plaintiff justifiably relied upon the defendant to communicate the material facts to the plaintiff; and (5) the plaintiff sustained damages as a result of the defendant's failure to communicate the material facts to the plaintiff.

*Stechschulte v. Jennings*, 297 Kan. 2, 21, 298 P.3d 1083, 1097 (2013). The court concludes that the uncontroverted evidence demonstrates fraud by silence in a clear and convincing fashion.[3]

Elfsten and Hasegawa knew of Waterfall's unbroken record of unfulfilled promises. They knew Waterfall's record and were obliged to tell their client Watchous. Under the circumstances, their failure can only be seen as intentional, arising because they wanted the nonrefundable fee. Watchous had no reason to know that reliance under the circumstances was unreasonable. *See Kelley Metal Trading Co. v. Al-Jon/United, Inc.*, 812 F. Supp. 185, 188 (D. Kan. 1993) (citing *Goff v. Am. Sav. Ass'n of Kan.*, 1 Kan. App. 2d 75, 561 P.2d 897, 903 (1977)).

By the express terms of the Agreement, Pacific was acting as Watchous's "agent" in seeking funding, and it was duty-bound to reveal material information to Watchous.

---

[3] The court rejects the contention that Watchous has failed to plead a claim of fraud by silence. The Second Amended Complaint alleges that "[n]either Pacific nor any other defendant informed Watchous" about the true financial condition of Waterfall. (Dkt. 168, ¶ 83). The claim is explicitly presented in the Pretrial Order. (Dkt. 285, at 12). The claim is correctly advanced in the pleadings. And even if it had not been, the court would allow amendment to expressly state it. The defendants have had the benefit of free and extensive discovery and will suffer no substantial prejudice.

As explained below, Pacific owed fiduciary duties to Watchous, which it violated. While Elfsten and Hasegawa were not acting as the express agent of Watchous, their willful participation in the fraud by silence supports the award of summary judgment.

The plaintiff justifiably relied on the rosy picture painted by the Pacific defendants. It is uncontroverted (Plf. Fact ¶ 234) that Watchous would not have made the deposit but for the failure to disclose the facts that Waterfall did not actually own the bonds, that it did not have liquid assets available to fund the joint venture, that it was in financial difficulty and had defaulted on millions of dollars in promissory notes, and that it had failed to fund any project Pacific brought to it. As a direct consequence of this reasonable reliance, Watchous made (and lost) the $175,000 deposit.

The court also grants summary judgment as to plaintiff's claims of actual fraud against the individual defendants. As to Elfsten and Hasegawa, the same considerations as to their failure to fully disclose Waterfall's history also support a finding of fraud as their affirmative representations. These include the statements that Elfsten and Mournes had known each other for a long time, that Pacific had done other transactions with Waterfall, that Waterfall could fund the proposed joint venture, that Waterfall had closed on other bonds, and that it at the very least had the resources to refund the $175,000 deposit. They either knew these representations were false, or they made them with reckless disregard for their truthfulness. The representations were made with the goal of getting Watchous into the relationship in the course of which Pacific would acquire its

nonrefundable deposit. Watchous reasonably relied on these representations and as a result, it was injured in the amount of $182,600.

The same is true as to the Waterfall defendants (Mournes, Duval, and Zouvas). Mournes and Zouvas indicated to Watchous that Waterfall owned the Venezuelan bonds. They did not inform Watchous that they had only a "beneficial" interest in the bonds, as they now characterize it. They did not tell Watchous that Waterfall had only a restricted right to the bonds. Between the Waterfall defendants and Watchous, only the former knew of these restrictions, and to the extent that they now claim that they did indeed have some kind of "ownership" in the bonds after all, their failure to speak in 2016 was fraud by silence.

Mournes represented that Waterfall had the ability to enter into an $80,000,000 joint venture with Watchous, and that Waterfall owned hundreds of millions of dollars' worth of bonds. Mournes also represented that Waterfall had cash it would use to repay the deposit.

At Waterfall's request, Pacific approached Watchous seeking the $175,000 deposit. Waterfall reviewed the proposal, which indicated that Waterfall would do a 50/50 joint venture and provide $80,000,000 on a set and short schedule. Zouvas directly indicated that Waterfall had "suites" of documents created for other funding transactions and that was how Waterfall "typically" set out terms of a joint venture "once we have a definitive agreement in place." The communications suggested, falsely, that Waterfall had successfully funded other joint ventures.

After Watchous asked for references of other joint ventures supported by Waterfall on July 28, 2016, Duval responded by supplying a list. This list, however, was not a list of joint venture participants. Rather, it was a list of persons closely associated with Waterfall, many of who were owed money by Waterfall.

The timing of these misrepresentations shows that they were made to encourage the "miracle" that Waterfall needed – inducing Watchous to make the $175,000 deposit. The misrepresentations were made intentionally, or with reckless disregard for their truthfulness. Watchous reasonably and justifiably relied on those representations by making the deposit, to its injury.

The court also grants summary judgment in favor of Watchous as to its claim of breach of fiduciary duty.

> The relationship existing between a principal and agent is a fiduciary one demanding trust and confidence, and requiring of the agent the same obligation of individual service and loyalty as is imposed upon a trustee in favor of the beneficiary. In all business transactions affecting the subject matter of an agency, it is the duty of the agent to act in good faith and with loyalty to further advance the interests of the principal. Where a fiduciary relationship is established the law views with suspicion all dealings in the subject matter of the agency to see that the agent has dealt in good faith and fairness, and that the agent has given the principal the full benefit of his knowledge and skill. If it appears the agent has been guilty of concealment, unfairness or has taken advantage of the confidential relationship, the advantage gained will not be allowed to stand. One who acts as an agent for and deals with his principal in the subject matter of the agency cannot take advantage of his principal by withholding information . . .

*Henderson v. Hassur*, 225 Kan. 678, 687, 594 P.2d 650, 658–59 (1979) (emphasis added) (citations removed).

Here the evidence is sufficiently strong to warrant a finding that Pacific breached its fiduciary duties to Watchous by failing to give an accurate account of Waterfall's history of failure and financial default. Had Pacific been truthful, Watchous would not have made the $175,000 deposit.

## RICO and Civil Conspiracy

The court denies the motions by the parties on the issue of the RICO claim. Watchous argues that the evidence establishes RICO liability. The defendants argue the establishes they are not liable under the statute. The court concludes that the evidence is not dispositive of the issue.

In its prior Order (Dkt. 167), the court reviewed the standards for liability under RICO. Such a claim requires proof that a defendant "(1) participated in the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Tal v. Hogan*, 453 F.3d 1244, 1269 (10th Cir. 2006) (citing *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1362 (10th Cir. 1989)).A pattern of racketeering requires at least "two instances of racketeering activity as defined in §1961(1) which amount to, or otherwise constitute a threat of continuing racketeering activity by the enterprise." *Bacchus Indus. v. Arvin Indus.*, 939 F.2d 887, 891 (10th Cir.1991). A RICO enterprise may arise from an association in fact, which exists:

> Under this test, a group must have "[1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle* [*v. United States*, 129 S.Ct. 2237,] 2244 [(2009)]. The Court explained the statutorily pertinent "purpose" by reference to its decision in [*United States v.*] *Turkette*, [452 U.S. 576 (1981), commenting that members of the group must share the "common purpose of engaging in a course of conduct." *Id.* at 2243 (quoting *Turkette*, 452 U.S. at 583, 101 S.Ct. 2254) (internal quotation mark omtted). As to the relevant "relationship," the Court explained that not only must members of the group only share a common purpose, there also must be evidence of "interpersonal relationships" aimed at effecting that purpose — evidence that the members of the group have "joined together" to advance "a certain object" or "engag[e] in a course of conduct." *Id.* at 2244. As to longevity, the Court held that the group must associate on the basis of its shared purpose for a "sufficient duration to permit an association to 'participate' in [the affairs of the enterprise] through 'a pattern of racketeering activity,'" *id.* (quoting 18 U.S.C. § 1962), though "nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence," *id.* at 2245.

*United States v. Hutchinson*, 573 F.3d 1011, 1021-22 (10th Cir. 2009).

In support of their argument against liability, the Pacific defendants argue they lacked any fraudulent intent, that there were an insufficient number of predicate acts (in the Watchous transaction, according to defendants, Waterfall only received the $175,000 deposit, Pacific the $7,600 fee, and Elfsten and Hasegawa nothing as individuals), and that no racketeering enterprise existed. As to the latter, the Pacific defendants characterize their relations with Waterfall as "often unharmonious," that there was no interpersonal relationship and Waterfall was simply "one of many potential financiers" used by Pacific, and Pacific only had "limited interactions" with Waterfall after it introduced a client to it. (Dkt. 294 at 29). The Waterfall defendants argue they cannot be an association-in-fact enterprise, because Pacific was not the exclusive finder for

Waterfall. They argue that a pattern of racketeering activity cannot exist, for example, because they told everyone that their ability to fund projects was contingent upon closing the bonds, and each financial transaction stood on its own.

Read in the light most favorable to the nonmovants, the court cannot conclude that the evidence is so strong that a RICO violation necessarily occurred. That is, the court concludes the evidence would support, but not compel, a finding defendants violated § 1962(c) . The factfinder could decide that Waterfall and Pacific were separate companies operating at arm's length, that their contacts were relatively limited, and that while Pacific and Waterfall indeed breached duties of full disclosure in the case of the Watchous transaction, the overall course of dealing between the two companies was not a course of a common racketeering scheme or plan.

At the same time, the factfinder could look at the same evidence and see a long history between the two that companies were founded by long-time friends, that operated as a "team," worked closely together in many transactions, and which (before and after the Watchous transaction) operated by a consistent scheme in which Pacific misrepresented or failed to accurately describe Waterfall's condition in order to obtain numerous nonrefundable deposits.

Watchous argues (Dkt. 311, at 17-18) that the "association in fact" enterprise is established by the extent of Pacific's work with Waterfall, in which they "collected thousands in fees based on misrepresentations," and "numerous predicate acts" which

at a minimum "obtaining the $175,000 deposit from Watchous and then, only a few months later, obtaining the deposit from KRG through similar misrepresentations."

As noted earlier, the evidence supports a finding of fraud in the Watchous transaction, in particular in the immediate series of communications which lured the plaintiff into providing the $175,000 payment to Waterfall. Whether other communications or transactions reflect a violation of the RICO statute cannot be resolved by the court. "[O]ur Circuit recognizes that '[w]hether a pattern [of racketeering activity] exists is a question of fact for the jury to determine.'" *In re: EpiPen* (*Epinephrine Injection, USP*) *Mktg., Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1320 (D. Kan. 2018) (quoting *Resolution Tr. Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir. 1993). Here, the existence of a pattern of racketeering activity — and whether there was an association in fact — are questions which required examination of each additional transaction, including the assessing the what Pacific's officers actually told a given client.

A civil conspiracy requires proof of "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Citizens State Bank, Moundridge v. Gilmore*, 603 P.2d 605, 613 (Kan. 1979). As with the existence of a RICO enterprise and pattern of racketeering activity, the court finds that deciding the scope of and membership in any conspiratorial agreement is a matter properly reserved for the trier of fact. The court concludes that holding individual defendants responsible for the alleged civil conspiracy requires weighing each transaction to determine each

defendant's intent and allegedly wrongful conduct. *See Rezac Lifestock Com'n Co. v. Pinnacle Banks*, 2019 WL 7116086, *6-7 (D. Kan. Dec. 23, 2019) ("the defendant against whom a civil conspiracy is alleged must personally have committed an unlawful act"). The nature and extent of any civil conspiracy should be resolved at trial.

In sum, the court concludes that the evidence does demonstrate that the individual defendants defrauded Watchous; and that in addition Pacific violated its fiduciary duty to Watchous, and that Watchous should recover as damages the amounts paid as deposits in July, 2016. However, while the same evidence suggests and supports finding a racketeering scheme (or a civil conspiracy) existed, the court concludes the evidence does not mandate such a result beyond a reasonable doubt.

## Additional Issues

In addition to its other arguments, the plaintiff moves for summary judgment (Dkt. 292, at 28-30) on the various affirmative defenses (waiver, unclean hands, estoppel, and failure to mitigate) asserted by the defendants. The defendants do not respond to these arguments, and the court grants summary judgment on the issue.

The Pacific defendants move for summary judgment in their favor on their claim for indemnification against the Waterfall Mountain entities. (Dkt. 301, at 36). The Pacific defendants assert they an oral agreement with Waterfall that it would pay any damages it might incur as a result of the present litigation. The Waterfall defendants do not oppose the claim, other than to stress that the individuals Mournes, Zouvas and Duval were not

parties to the agreement. (Dkt. 305, at 13). As the indemnification cross-claim is directed at "Waterfall Mountain USA LLC, Waterfall Mountain LLC and Waterfall International Holdings, LLC," (Dkt. 179, at 23), there is no basis for deferring a ruling. The court grants summary judgment in favor of the Pacific defendants on their cross-claim for indemnification.

IT IS ACCORDINGLY ORDERED this day of March, 2020, that the defendant's Motions for Summary Judgment or Partial Summary Judgment (293, 294, 295, 296) are denied, except that the Pacific defendants' Motion is granted as to its cross-claim for indemnification; plaintiff's Motion for Summary Judgment (Dkt. 291) is granted in part and denied in part, as provided herein.


*J. Thomas Marten*
J. Thomas Marten, Judge